IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

DISABILITY RIGHTS MISSISSIPPI,
LEAGUE OF WOMEN VOTERS OF
MISSISSIPPI, WILLIAM EARL WHITLEY,
MAMIE CUNNINGHAM, and YVONNE
GUNN,

                *Plaintiffs*,

v.

LYNN FITCH, in her official capacity as
Attorney General of the State of Mississippi;
MICHAEL D. WATSON, JR., in his official
capacity as Secretary of State of Mississippi;
GERALD A. MUMFORD, in his official
capacity as Hinds County Attorney; and
ELIZABETH AUSBERN, in her official
capacity as Chickasaw County Attorney;

                *Defendants*.



Civil Action No.

## DECLARATION OF POLLY TRIBBLE ON BEHALF OF DISABILITY RIGHTS MISSISSIPPI

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. I, Polly Tribble, am over the age of 21 and fully competent to make this declaration. Under penalty of perjury, I declare the following based upon my personal knowledge:

2. I have been the Executive Director of DRMS since 2017 and worked at DRMS in a variety of roles for over 30 years. In this role, I oversee the day-to-day management of all operations of DRMS.

**Background on DRMS**

3. Since 1982, DRMS has provided advocacy services — free of charge — to Mississippians with disabilities. Our agency has helped improve the lives of thousands of our state's most vulnerable population by championing their rights.

4. DRMS is incorporated as a non-profit organization in the State of Mississippi and has been designated by the State of Mississippi since 1982 as the State's protection and advocacy system ("P&A") to protect the legal and human rights of individuals with disabilities in the state of Mississippi. This designation is currently pursuant to the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. § 10801 et seq., the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15041 et seq., and the Protection and Advocacy for Individual Rights Program of the Rehabilitation Act, 29 U.S.C. § 794e.

5. As the designated P&A, DRMS is authorized to pursue administrative, legal, and other appropriate remedies to protect and advocate for the legal rights of individuals with disabilities and to redress incidents of discrimination in the state. DRMS has the authority to prosecute actions in its own name and on behalf of its constituents. 42 U.S.C. § 15043(a)(2)(A)(i). DRMS is the only disability advocacy agency in Mississippi with attorneys on staff to pursue legal remedies if necessary.

6. DRMS represents the interests of, and is accountable to, members of the DRMS disability community, and its funding is dependent on compliance with a governance structure that ensures oversight and control by the disability community.

    a. DRMS is governed by a Board of Directors — many of whom have a disability or a family member with a disability. Our 11 Board members have diverse experience and

represent different regions of the state, but all share a commitment to protecting the rights of Mississippians with disabilities.

   b. Our PAIMI Advisory Council, which is comprised of people who have pyschiatric disabilities, or are family members of, or work directly with, people with psychiatric disabilities, is charged with supplying information about issues relating to individuals with psychiatric disabilities. They provide independent advice and recommendations; work jointly with our Governing Board in the development of policies and priorities; and contribute to our annual report.

   c. DRMS seeks public input on the direction of its work through its Board of Directors, PAIMI Advisory Council, and other public forums and presentations. DRMS also has a grievance process whereby community members can file complaints about DRMS's services.

7. DRMS participates in this action on behalf of its constituents who are qualified voters with disabilities throughout the state. DRMS's constituents are residents of Mississippi with disabilities, as that population is defined by federal and/or state law.

8. DRMS's constituents for our voting program include all voters with disabilities throughout Mississippi, including people who are in institutions, such as nursing facilities, psychiatric hospitals, group homes, jails, prisons, and other congregate settings. Central to our mission is empowering Mississippians with disabilities to participate fully and independently as active and engaged citizens.

9. DRMS has been an organizational plaintiff in a number of cases. For example, currently we are an organizational plaintiff in *Eric Wallace et al v. Mississippi Dept of Corrections, et al*, 3:21-cv-516-CWR-LGI (S.D. Miss., filed Aug. 2021), a case challenging the Mississippi Department of Corrections over lack of adequate mental health and medical care as well as ADA

3

accessibility issues. Previously we were an organizational plaintiff in *J.H., et al. v. Hinds County, Mississippi*, 3:11-cv-327-DPJ-FKB (S.D. Miss., June 2, 2011), a class action case which protected the federal rights of children detained pre-trial and post-disposition in Hinds County's youth detention facility.

**DRMS's Voting Work**

10. Ensuring and promoting access to voting by people with disabilities is germane to DRMS's purpose and is directly in keeping with DRMS's overarching purpose: the protection of, and advocacy for, the rights of Mississippians with disabilities. Access to the ballot is important for all citizens, and we strive to ensure all aspects of public life – including voting, as well as access to buildings, employment, and education – are inclusive to people with disabilities. Mississippians with disabilities are often overlooked in the voting process, and it's our job as a P&A to ensure they have access to voting on equal terms with people without disabilities. In sum, voting work is crucial to our mission.

11. We hear often from our constituents that they are interested in voting and elections as a way to advance their political interests and make their voices heard. Around election time, we become like an emergency response team fielding requests from people with disabilities facing access barriers in the polling process — ranging from trying to gain physical access to a polling place, to trying to navigate the absentee voting process, to getting the IDs that they need for voting. We hear a lot from people who feel that absentee voting is not easy and who want help navigating the process. We often provide education about absentee voting to individuals with disabilities.

12. DRMS is the designated agency in Mississippi to receive an annual grant, called Protection and Advocacy for Voting Access ("PAVA") pursuant to the Help America Vote Act ("HAVA"). Under that program, DRMS is required to promote access and engagement in

4

the electoral process for voters with disabilities. DRMS's current goals for the PAVA program are to promote full participation in the electoral process for individuals with disabilities, including educating candidates on campaign accessibility, encouraging exercise of constitution rights, and reassessing methods for determining polling site accessibility and distributing that data. We also hold voter registration events and pursue alternative educational and awareness methods, such as traditional and digital advertising.

**Impact of S.B. 2358 on DRMS's Constituents**

13. Senate Bill 2358 will have a significant impact on the ability of Mississippians with disabilities seeking to exercise their right to vote.

14. Specifically, people with mobility disabilities or other impairments that limit one's ability to walk or to use mail often need to rely on people other than family or household members or caregivers to assist them with returning absentee ballots. Those individuals will be prevented from voting under Senate Bill 2358 or will, at best, have to ask more people and incur more burdens to be able to cast their ballots. For example, many people with disabilities rely on assistance with sealing an envelope, folding piece of paper, or inserting a ballot into a mail box, and they receive that assistance from friends, neighbors, or other trusted community members.

15. Also, residents of congregate facilities specifically rely on others to help them send and receive all mail, including absentee ballots, because of their residing in an institution (including for reasons of a disability). When someone lives in a facility (whether a nursing facility, long-term care facility, mental health facility, developmental disability facilities, group home, jail, or prison) they usually do not deposit or receive their own mail. Rather, their mail typically goes through a receiving line. In other words, residents are generally not the first person to touch their mail when it is received, nor are they the last person to handle their

mail when they send it. All mail coming in and going out is typically handled by facility staff. Facility residents usually do not have the choice as to who handles their mail; they are required to send and receive their mail in this way. This is true even of low-level security institutions. As a result, S.B. 2358 disenfranchises people with disabilities who have to rely on others to help them with their mail, due to their status as facility residents.

16. Without the ability to get assistance from a staff member, who may be the only available potential assistor, many of our constituents in those settings will be prevented from voting altogether.

17. Also, although S.B. 2358 says that "caregivers" of people with disabilities can assist with ballot return, we have no way to know what "caregiver" means in precise terms. The statute does not define the term and the state has not offered the public any guidance about it. Because of the lack of a clear or official definition of "caregiver," we cannot give nursing home or long-term care residents, or other constituents who reside in group homes, jails or prisons, or other institutions definitive information about whether staff qualify as "caregivers." And, while we would typically take on the role of educating facility staff as to their role in the voting process, we do not know how to advise facility staff on this issue. Our staff who conduct trainings in facilities are not attorneys, and cannot give legal advice as to the meaning of "caregiver," so our general practice is to not give advice to facility staff as to what "caregiver" means. Likewise, we do not know whether, for example, a personal assistant to a person with a disability, a friend or neighbor who helps a person with a disability with errands or tasks, or a social worker, count as "caregivers."

18. This confusion will have a chilling effect on people who would otherwise assist voters. For example, we believe that under the new law, staff at nursing facilities will refuse to help residents vote because it is not clear whether they would meet the "caregiver" definition or

be subject to criminal penalties. In our experience, facility staff members will typically exercise an abundance of caution and err on the side of protecting themselves legally. Seeing a criminal penalty in the statute, most staff will not want to be even on the periphery of what is allowed or take on any risk of criminal liability. Again, this will especially prevent people in institutions, including group homes, nursing facilities, psychiatric hospitals, or other congregate settings, from voting.

19. Senate Bill 2358 also leaves DRMS in the position of having conflicting guidance under federal and state law. Prior to S.B. 2358, DRMS understood that voters could choose any assister other than the categories excluded under Section 208— a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union. Now, in an abundance of caution and to avoid putting our members at risk of criminal liability, we are likely to advise individuals to comply with state law, frustrating rights that exist under federal law.

**DRMS's Response to S.B. 2358**

20. Educating voters about absentee voting will become much more difficult with this law. We anticipate getting specific complaints about S.B. 2358 and having to train volunteers on how to respond. We also needed to update our voter education materials to account for the new law.

21. In particular, with S.B. 2358's passage, we have had to undertake entirely new efforts to conduct voter education in facilities. Typically, our monitors go into facilities to conduct rights presentations and undertake other monitoring tasks. Prior to S.B. 2358, our rights presentation included some information about voting, such as the dates and times of upcoming elections and information about how to register, but voting typically was only a short component and many other topics were covered.

22. Now, we have developed a separate training protocol on S.B. 2358 specifically that takes up a substantial portion of our rights presentations in facilities. Informing voters about S.B. 2358's new requirements will take up one-third to one-half of the total rights presentation. We also developed a new Powerpoint and a one-page sheet to give out in facilities about the new law. We will hold at least 3 trainings at each of 10 facilities across the state, and at least one in each of 13 Regional Community Mental Health Centers, at least 43 trainings in total. We also expect to conduct more trainings at nursing homes than those 43, and have more trainings scheduled in the lead-up to the August 2023 primary, as we anticipate even more of our contacts at facilities will ask us to hold trainings. This rights training work about S.B. 2358 has already started and will intensify up through the August primary.

23. As an overview, since Senate Bill 2358 was passed, DRMS has diverted time and resources to responding to it, including the following:

    a. Created new training materials for DRMS staff who conduct facility monitoring, including a one-page flyer and a Powerpoint geared toward residents of facilities about S.B. 2358, which consists of multiple slides.

    b. Held over 4 hours of meetings with monitors to train them and give a general script to go over during facility monitoring, and covering our S.B. 2358 in our monthly team check-ins about our facility monitoring work.

    c. Devoting about one-third to one-half of our usual rights monitoring presentations to S.B. 2358, and answering residents' and staff members' questions about it.

24. We have limited staff and because of S.B. 2358 our staff will need to take on additional work to conduct these trainings. We are a small organization, with 22 staff members covering work across 82 counties and covering a wide variety of issues ranging from disability discrimination to access to education. Because PAVA funding is capped per-year, money we

spend to respond to S.B. 2358 takes away from that overall budget and depletes funding from other programs, such as get-out-the-vote work. The rights trainings about S.B. 2358 are urgent as they must happen before the August 2023 primary, so they take precedence in our work over other tasks. We have had facility residents tell us we're the only group talking to them about voting, so we know that other organizations will not take on this work of educating residents about S.B. 2358.

25. Having to devote so much time in our rights presentations also takes away the time our facility monitoring staff would otherwise spend on other types of monitoring. Usually, our staff members go into communal areas of facilities, speak with residents, check discharge plans, and investigate allegations of potential abuse and neglect. As more time now needs to be spent on the new voting presentation, the other time spent on monitoring is reduced. If a monitor is spending more time on rights training, then they are missing time spent speaking with residents about the conditions. As such, there is greater potential for missing chances to learn of time-sensitive instances of abuse and neglect. There is no other organization doing the facility investigation work that we do, as we are the only agency with the specific legal authority to go into facilities and do this type of monitoring. If a court were to halt the law, we could stop our S.B. 2358-related work and get back time to do our usual monitoring of potential abuse and neglect of our constituents.

26. The confusion and disruption created by S.B. 2358 make our work more difficult because we have to undertake such substantial new efforts to educate both staff and voters. It frustrates our role as a P&A and our only recourse is to seek relief from the court.

I declare under penalty of perjury that the statements above are true

This the 31st day of May, 2023.

_____
Polly Tribble, Executive Director

Sworn to and subscribed before me this the 31st day of May, 2023.

_____
Notary Public

[Notary seal: STATE OF MISSISSIPPI NOTARY PUBLIC, ID # 148319, JENELL MINOR, Commission Expires Aug. 21, 2023, HINDS COUNTY]