IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

DISABILITY RIGHTS MISSISSIPPI,
LEAGUE OF WOMEN VOTERS
OF MISSISSIPPI, WILLIAM EARL
WHITLEY, MAMIE CUNNINGHAM,
and YVONNE GUNN                                                                    PLAINTIFFS


CIVIL ACTION NO. 3:23CV-350-HTW-LGI

LYNN FITCH, in her official capacity as
Attorney General of the State of Mississippi;
MICHAEL D. WATSON, JR., in his official
Capacity as Secretary of State of Mississippi;
GERALD A. MUMFORD, in his official capacity
As Hinds County Attorney; and ELIZABETH
AUSBURN, in her official capacity as Chickasaw
County Attorney                                                                        DEFENDANTS

---

**ATTORNEY GENERAL LYNN FITCH AND SECRETARY OF STATE MICHAEL
D. WATSON, JR.'S, RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

---

## INTRODUCTION

This Court should deny plaintiffs' motion for preliminary injunction [Doc.   2]

seeking to halt the State's implementation of an important safeguard in preserving the

integrity of Mississippi's elections. In fact, election integrity is among the State's highest

and most profound interests and the Constitution grants states broad policy-making

authority to regulate elections. To that end, the Governor signed Senate Bill 2358 ("S.B.

2358") passed by the Legislature during the 2023 Regular Session. This law prohibits

"ballot harvesting," meaning that a "person shall not knowingly collect and transmit a

ballot that was mailed to another person." *Id*. S.B. 2358 contains broad categories of persons who may collect and transmit ballots. Moreover, S.B. 2358 is confined to the knowing "collection" and "transmission" of ballots by third parties not authorized by law. The law does not implicate any other aspect of Mississippi's Election Code framework.

S.B. 2358 exempts family members, household members, or caregiver of the person to whom the ballot was mailed from the prohibition on ballot harvesting. S.B. 2358(1)(d). The American Medical Association defines caregiver as "any relative, partner, friend or neighbor who has a significant personal relationship with, and provides a broad range of assistance for a child or an adult with a chronic or disabling condition."[1] The law also exempts election officials, employees of the United States postal service in their official duties, any other individual who is allowed by federal law to collect and transmit United States mail while engaged in their official duties, and common carriers that transport goods for a fee. S.B. 2358(1)(a) – (e).

Plaintiffs seek extraordinary injunctive relief to block S.B. 2358 from taking effect on July 1, 2023. *See* S.B. 2358, Section 2 ("This act shall take effect and be in force from and after July 1, 2023"). Plaintiffs maintain Section 208 of the Voting Rights Act ("VRA") affords unfettered choice as to who may collect and transmit their ballot and that S.B. 2358 impermissibly limits this choice. [Doc. 1 (¶ 22)]. They allege that S.B. 2358 conflicts with Section 208 and is preempted under the Supremacy Clause of the Constitution. *Id*. But plaintiffs' preferred reading is not faithful to Section 208's text or legislative history. In fact, courts have rejected plaintiffs interpretation in favor of a view that state laws

---

[1] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/public-health/caregiver-burnout-guide.pdf  (Last accessed June 10, 2023).

limiting a voter's choice in who may assist in transmitting and/or collecting ballots does not categorically run afoul of Section 208.

The issue is a question of law – whether S.B. 2358 comports with Section 208 of the VRA, 52 U.S.C. § 10508. The answer is – yes. Consistent with Section 208, S.B. 2358 allows a voter "who requires assistance to vote by reason of blindness, disability, or inability to read or write [to be] given assistance by a person of the voter's choice." *See* 52 U.S.C. § 10508. S.B. 2358 can be read in harmony with Section 208 and is not preempted.

For several reasons, the Court should reject plaintiffs' bid to block S.B. 2358. First, plaintiffs lack a substantial likelihood of success on the merits. The organizational plaintiffs lack standing. The individual plaintiffs cannot demonstrate a likelihood of success on the Section 208 claim.[2] Moreover, the equitable factors favor the State and weigh against granting injunctive relief. The Supreme Court has been clear that a state has a compelling interest in preserving the integrity of its election process. S.B. 2358 inherently reflects this compelling interest by prohibiting ballot harvesting. And the State is harmed any time a state law is enjoined by a federal court on behalf of a handful of plaintiffs. This is particularly true with respect to protecting the integrity of elections in Mississippi. Injunctive relief should be denied.

### The State's Absentee Voting Laws

The Mississippi Election Code establishes, as a whole, a comprehensive in-person voting system, with a few exceptions for absentee balloting. Mississippi's modern Election

---

[2] The allegations regarding the individual plaintiffs' standing should be taken as true for purposes of this motion only. Certain individual plaintiffs may fail to state a claim under Section 208, but this is not presently before the court in the preliminary injunction stage of the proceedings.

Code, originally enacted in 1986, governs all elections in the State, including the mechanics of voting, such as ballot-building, voting systems, absentee balloting, and the conduct of elections. *See* MISS. CODE ANN. § 23-15-1 *et seq.*, § 23-15-331 *et seq.*, § 23-15-391 *et seq.*, § 23-15-541 *et seq.*, § 23-15-621 *et seq.* The following categories of voters may cast their absentee ballots in-person or by mail:

- voters temporarily residing outside of their home county;

- voters age 65 or over;

- voters with a permanent or temporary physical disability; and

- voters who are parents, spouses, or dependents of persons who are hospitalized with a qualifying permanent or temporary physical disability and will be with the disabled person on election day.

MISS. CODE ANN. § 23-15-715(b).

### S.B. 2358 is Signed into Law

On March 22, 2023, the Governor signed S.B. 2358:

**<u>Section 1.</u>**  (1) A person shall not knowingly collect and transmit a ballot that was mailed to another person, except as follows:

(a)  An election official while engaged in official duties as authorized by law.

(b)  An employee of the United States Postal Service while engaged in official duties as authorized by law.

(c)  Any other individual who is allowed by federal law to collect and transmit United States mail while engaged in official duties as authorized by law.

(d)  A family member, household member, or caregiver of the person to whom the ballot was mailed.

(e)     A common carrier that transports goods from one place to another for a fee. No parcel shall contain more than a single ballot.

(2)     Any violation of this section shall be subject to the penalties of Section 97-13-37.

**Section 2.** This act shall take effect and be in force from and after July 1, 2023. *See* 2023 Leg., Reg. Sess. (Miss. 2023).

## Plaintiffs' Lawsuit and Preliminary Injunction Motion

Plaintiffs' complaint asserts one count that S.B. 2358 violates 52 U.S.C. 10508 of the VRA. [Doc. 1 at 17. Plaintiffs say that S.B. 2358 "impermissibly restricts voters with disabilities from having a person of their choice assist them in submitting their completed mail-in absentee ballots." *Id.*, ¶ 4. This, according to plaintiffs "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress and should be preempted." *Id.*, ¶ 81 (internal quotation and citation omitted).

On May 31, 2023, plaintiffs moved for preliminary injunctive relief. [Doc. 2, 3]. Lynn Fitch, in her official capacity as Attorney General of Mississippi, and Michael D. Watson, Jr., in his official capacity as Secretary of State of Mississippi ("State Defendants"), file this response in opposition to the plaintiffs' urgent and necessitous motion for preliminary injunction [Doc. 2]. This Court set the motion for hearing on June 13, 2023, at 9:30 a.m.

Plaintiffs seek a preliminary injunction: (1) enjoining S.B. 2358 from going into effect on July 1, 2023; (2) enjoining the Defendants from implementing or enforcing S.B. 2358 to the extent that it would prohibit voters who are disabled or blind or who have limited ability to read or write from receiving assistance from the person of their choice;

and (3) enjoining the Defendants from issuing any instructions or communications—whether public facing or otherwise—indicating that voters may not seek assistance except for the categories defined in S.B. 2358 and order the Defendants to issue corrective instructions that voters who require assistance due to blindness, disability, or difficulty reading or writing may continue to seek assistance from any person of their choice, except for the exclusions defined under Section 208 of the VRA. [Doc. 2 (¶¶ 1-3)].

## **ARGUMENT**

Preliminary injunctive relief is an extraordinary remedy. *See Exhibitors Poster Exch. Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561-62 (5th Cir. 1971); *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) ("A preliminary injunction is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion"). To obtain a preliminary injunction, plaintiffs must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) the threatened injury to the movant outweighs any harm to the nonmovant that may result from the injunction; and (4) the injunction will not disserve the public interest. *Beswick v. Barr*, Civil Action No., 2020 WL 3520312, at *3 (S.D. Miss. June 29, 2020).

The last two requirements for injunctive relief merge and are considered together when the government is the opposing party. *Pacharne v. Dep't of Homeland Sec.*, 565 F. Supp. 3d 785, 802 (N.D. Miss. 2021). Because a preliminary injunction is an extraordinary remedy, it "should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors." *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*,

878 F.2d 806, 809 (5th Cir. 1989)). "Equitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). *See also Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (quoting with approval *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring)). All plaintiffs, in one respect or another, fail to satisfy all of the injunction factors, and their motion should be denied.

## I.     Plaintiffs Lack a Substantial Likelihood of Success on the Merits.

### A.     The organizational plaintiffs lack standing.

A moving party who lacks standing cannot obtain preliminary injunctive relief.  *See Prestage Farms, Inc. v. Bd. of Supervisors of Noxubee Cnty., Miss.*, 205 F.3d 265, 267-68 (5th Cir. 2000). Plaintiffs' motion includes claims invoked by three individuals, William Earl Whitley (voter plaintiff), Mamie Cunningham (assistor plaintiff), Yvonne Cunningham (assistor plaintiff) (collectively "individual plaintiffs"), and two plaintiff organizations, Disability Rights Mississippi ("DRMS") and the League of Women Voters Mississippi ("LWV-MS") (collectively "organizational plaintiffs").[3]

An organization "can establish standing in its own name if it meets the same standing test that applies to individuals." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (citation omitted). "[T]he irreducible constitutional minimum of standing contains three elements:" an (1) injury in fact (2) that is fairly traceable to the

---

[3] All plaintiffs' claims are based on a single count brought pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2; Section 208 of the Voting Rights Act of 1965, 52 U.S.C. 10508; 42 U.S.C. § 1983. [Doc.1 at 17-19].

challenged conduct (3) that would be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

To prove the first element of standing, a plaintiff's alleged injury in fact must be "concrete, particularized, and actual or imminent." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). In other words, the injury must be "certainly impending," *Lujan*, 504 U.S. at 564 n.2-3, and "[a]llegations of possible future injury" will not suffice, *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990). "Federal courts consistently deny standing when [the] claimed anticipated injury has not been shown to be more than uncertain potentiality." *Prestage Farms*, 205 F.3d at 268. "The possibility, that maybe, in the future, if a series of events occur, [a plaintiff] might suffer some injury is clearly too impalpable to satisfy the requirements of Art. III." *Trinity Indus., Inc. v. Martin*, 963 F.2d 795, 799 (5th Cir. 1992).

Nonprofit organizations can suffer an Article III injury when a defendant's actions frustrate their missions and force them to "divert[ ] significant resources to counteract the defendant's conduct." *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010). Organizational standing based on diversion of resources arises when "the defendant's conduct significantly and perceptibly impaired the organization's ability to provide its activities—with the consequent drain on the organization's resources." *Id.* at 238 (internal quotation marks omitted).

Such an injury predicated on an alleged diversion of resources must be "concrete and demonstrable." *Id.* Accordingly, "[n]ot every diversion of resources to counteract the [defendants'] conduct . . . establishes an injury in fact." *Id.* To establish this type of injury in fact, an organization must do more than simply allege a setback to its abstract social

interests. *See Sierra Club v. Morton*, 405 U.S. 727, 729 (1972). "It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

And the second and third elements are even clearer. For example, an injury is not "fairly traceable" to a defendant's conduct if its existence depends on people or forces outside of the court's control. *See Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009); *see also Clark v. Edwards*, 2020 WL 3415376, at *14 (M.D. La. June 22, 2020). Similarly, to establish redressability, a plaintiff must demonstrate that an order against the defendants would remedy the harm about which they complain. *See Fusilier v. Landry*, 963 F.3d 447, 467 (5th Cir. 2020) (Duncan, J., dissenting in part and concurring in the judgment in part).

Neither LWV-MS nor DRMS have established organizational standing because neither has suffered a "concrete and demonstrable" injury in fact. *City of Kyle*, 626 F.3d at 238. To be sure, LWV-MS and DRMS both cite a diversion of resources as the basis for their alleged injury in fact. Both organizations say they have diverted resources away from their typical voter-related efforts to educating voters due to S.B. 2358. [Doc. 1 at 5-6 (¶¶ 21, 31-33; 34-38)]; [Doc. 3-2 (¶¶ 21, 22, 23)]; [Doc. 3-5 (¶ 13)]. But both organizations readily admit that they already engage in on-going voter-related education as part of their organizational missions. [Doc. 1 at 8 (¶ 32)] ("Protecting the voting rights of individuals with disabilities is germane to DRMS's purpose and mission. DRMS effectuates this mission by assisting Mississippi voters in every step of the voting process from voter

registration to monitoring polling accessibility") [Doc. 3-2 (¶ 10)] ("Ensuring and promoting access to voting by people with disabilities is germane to DRMS's purpose and is directly in keeping with DRMS's overarching purpose. . ."). LWV-MS's declaration contains one sentence related to the alleged diversion of resources due to S.B. 2358. [Doc. 3-5 (¶13)] ("Because of the criminal penalties of S.B. 2358, we now have to create new materials to warn voters about this law"). On balance, LWV-MS's declaration recounts its general purpose regarding voter education and outreach. [Doc. 3-5 (¶¶ 6-14)].

The cited diversion of resources by the organizational plaintiffs to accommodate S.B. 2358 does not represent a significant diversion away from either organization's stated original mission. *Clark*, 2020 WL 3415376, at *13. In other words, LWV-MS and DRMS "have not alleged that the diversion of resources concretely and 'perceptibly impaired' [their] ability to carry out their purpose." *Miller v. Hughes*, 2020 WL 4187911, at *5 (W.D. Tex. July 10, 2020) (citation omitted).

And neither LWV-MS nor DRMS has specifically concretely identified what activities it diverted resources from in order to combat the defendants' alleged misconduct. *Compare Jacobson v. Fla. Sec'y of State*, 2020 WL 5289377, at *9 (11th Cir. Sept. 3, 2020) (requiring plaintiffs claiming organizational standing "explain[ ] what activities [they] would divert resources away *from* in order to spend additional resources on combatting" the challenged harms) (emphasis in original) with [Doc. 3-2 ¶ 10 (DRMS's Voting Work, "[e]nsuring and promoting access to voting by people with disabilities is germane to DRMS's purpose and is directly in keeping with DRMS's overarching purpose") [Doc. 3-5 (¶¶ 6-13)] (describing normal voter program of voter services).

For its part, DRMS says that its "staff will need to take on additional work to conduct these trainings" and it is "[d]evoting about one-third to one-half of our usual rights monitoring presentations to S.B. 2358 and answering residents' and staff members' questions about it." [Doc. 3-2 (¶¶ 23(c) and 24)]. But this would be true about any change to Mississippi's Election Code. And given DRMS's overall stated mission regarding voter training, education and outreach, [Doc. 1 (¶¶ 31-33); Doc. 3-2 (¶¶ 10-11)], a change created by S.B. 2358 is insufficient to demonstrate an injury in fact. "To hold otherwise would be to hold tha[t] any change in state election law gave nonprofit organizations like [these] standing to sue, simply because they were forced to incorporate the new legal landscape into their education and outreach efforts." *Clark*, 2020 WL 3415376, at *13. "It cannot follow that every change in voting laws that causes voting advocacy groups to 'check and adjust' is an injury." *See id*. Put differently, just because DRMS and LWV-MS have adjusted their existing voter-related content and meetings to address S.B. 2358 does not satisfy the causation requirement for demonstrating standing.

### B. LWV-MS and DRMS Cannot Establish Associational Standing.

"An organization that establishes associational standing can bring suit on behalf of its members even in the absence of injury to itself." *Martinez-Rivera*, 166 F. Supp. 3d at 787 (citation omitted). "An association has standing to bring suit on behalf of its members when [1.] its members would otherwise have standing to sue in their own right; [2.] the interests it seeks to protect are germane to the organization's purpose; and [3.] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tex. Democratic Party v. Hughes*, 2020 WL 4218227, at *4 (W.D. Tex. July

22, 2020) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)), *reverse on other grounds, Tex. Democratic Party v. Hughes*, 860 Fed. Appx. 874 (5th Cir. 2021) (holding Secretary of State lacks sufficient connection to the enforcement of the alleged wet signature rule for the *Ex parte Young* exception to apply).

To satisfy the first element, at least one member of the association must be able to satisfy the ordinary standing inquiry. *Hancock Cty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012). As with other standing analyses, the injury in fact for associational standing cannot "merely amount to generalized grievances about the government." *Martinez-Rivera*, 166 F. Supp. 3d at 787 (concluding that an organization lacked associational standing based on its generalized allegations of undermined voter confidence and potential vote dilution). Without a particularized injury in fact, an association's members lack standing to sue. *See id.*; *accord Miller*, 2020 WL 4187911, at *5 ("Committee Plaintiffs' allegations merely suggest, in the abstract, that some members . . . may be harmed in the 2020 general election. Such allegations are insufficient for associational standing because the alleged injury is neither concrete nor imminent.").

The third element is typically satisfied only when the association's interests are "identical" to the interests of its members. *See Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 588 (5th Cir. 2006). To demonstrate this congruity of interest, LWV-MS and DRMS must establish that their claims are not fact-specific to individual members. *See Ruhr*, 487 F. App'x at 198 (citing *Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 577 (5th Cir. 2002)).

If "individualized assessments and fact-intensive inquiries into each member's claims" are "necessary for the proper adjudication of this case," the third element of associational standing is not satisfied. *Warth v. Seldin*, 422 U.S. 490, 515-516 (1975) (holding that associational standing is not available when the alleged injuries require "individualized proof"). In other words, LWV-MS and DRMS must demonstrate that nothing about this lawsuit requires the participation of individual members. *See Benkiser*, 459 F.3d at 588.

Even assuming that LWV-MS and DRMS can establish the first and second elements, their claim to associational standing fails on the final prong. That is, the interests that LWV-MS and DRMS seek to advance through this litigation are not "identical" to the interests of any members. The organizational plaintiffs seek to advance their generalized mission of voter information [Doc. 3-2 (¶ 10)] (DRMS's Voting Work, "[e]nsuring and promoting access to voting by people with disabilities is germane to DRMS's purpose and is directly in keeping with DRMS's overarching purpose") [Doc. 3-5 (¶¶ 6-13)] (describing normal voter program of voter services). The LWV-MS says it has "at least one member who, as far back as 2008, has assisted voters in jail with registering and voting by mail, including by helping individuals return their ballots." [Doc. 3-5 (¶ 14)]. Because the organizational plaintiffs' asserted basis for qualification of associational standing rests on the particularized circumstances of a particular voter assistor – and not even as an actual voter – the participation of individual members is required.

Further, the fact that individuals are named plaintiffs proves the particularized nature of the inquiry. It is axiomatic that individual participation is required, meaning

that the interests of the individual plaintiffs are not "fully represented" by LWV-MS and DRMS. *See Benkiser*, 459 F.3d at 588. Moreover, the claim to associational standing fails when considering the individual evidence presented in conjunction with plaintiffs' motion. [Doc. 2, 3]. The organizational plaintiffs lack standing.

> **C.** **Section 208 does not preempt S.B. 2358, and plaintiffs cannot establish a likelihood of success on the merits.**

Th plaintiffs cannot establish a likelihood of success on the merits and cannot satisfy the first prong for injunctive relief. Plaintiffs say that S.B. 2358 conflicts with and is preempted by Section 208 of the VRA. [Doc. 3 at 13]. But the statute's text and legislative history confirms plaintiffs construe Section 208 too broadly. Section 208 states: "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

While Section 208 provides that a covered person may be given assistance by a person of their choice, the statute's "language suggests that some state law limitations on the identity of persons who may assist voters is permissible." *Priorities USA v. Nessel*, --- F. Supp.3d ---, 2022 WL 4272299 at *10 (E.D. Mich. Sept 15, 2022). Section 208's text, legislative history, and case law favor the view that S.B. 2358 is a valid exercise of the State's historic powers to regulate elections.

> **(1)** **Section 208 does not preempt S.B. 2358**

Whether Section 208 preempts S.B. 2358 is a pure legal question. 2022 WL 4272299 at *10. "[T]he purpose of Congress is the ultimate touchstone in every pre-

emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) (internal quotation marks omitted); *see Retail Clerks v. Schermerhorn*, 375 U.S. 96 (1963). In *Wyeth v. Levine*, 555 U.S. 555, 565 (2009), the Supreme Court said that "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Lohr*, 518 U.S., at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

There is a presumption that the "historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Group*, 555 U.S. 70, 76 (2008) (quoting *Santa Fe Elevator Corp.*, 331 U.S. at 230). "[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Id.* (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)). The presumption operates both to prevent and to limit preemption. *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010). Based on the proper reading of Section 208 and the legislative history, it cannot be said that Section 208 demonstrates Congress' clear and manifest purpose to prohibit all state laws that limit who can assist a voter. S.B. 2358 thus constitutes a valid exercise of the State's historic powers to regulate elections.

Plaintiffs rely heavily on the Fifth Circuit's decision in *OCA-Greater Houston*. [Doc. 3 at 14-15]. But plaintiffs overstate the court's holding relative to its impact on S.B. 2358 and Section 208. Plaintiffs suggest that the court actually held "Section 208 guarantees to

voters [the] right to choose *any person they want*, subject only to employment-related limitations, to assist them." [Dkt. 3 at 15] (emphasis plaintiffs). But a plain reading reveals plaintiffs' quoted passage was OCA's preferred interpretation of Section 208 – not the court's language. The court summarized the parties' respective positions:

> Texas argues that the term ["to vote"] refers only to the literal act of marking the ballot, so the right to 'assistance by a person of the voter's choice' referenced in the section applies only for that purpose. It says its Election Code's assistor provisions provide its voters with the full scope of assistance guaranteed by Section 208 by offering near-unfettered choice of assistance *inside the ballot box*. The supplemental interpreter right, which extends beyond the ballot box, Texas argues, is beyond Section 208's coverage, meaning that the § 61.033 restriction on voter choice cannot be in conflict.

> OCA reads 'to vote' in Section 208 more broadly. It argues that the term refers to more aspects of the voting process than the mere act of marking the ballot. Examples it offers are navigating the polling location and communicating with election officials. *Under OCA's reading, Section 208 guarantees to voters to right* [sic] *to choose any person they want, subject to only employment-related limitations,* to assist them throughout the voting process; hence Tex. Elec. Code § 61.033 imposes a limitation on voter choice unsupported by, and therefore in conflict with, Section 208.

867 F.3d at 614 (emphasis in first para. in original; emphasis in second para. supplied).

In reconciling the parties' views on Section 208, the court said the "unambiguous language of the VRA resolves the parties' disagreement. The word 'vote' is expressly defined in 52 U.S.C. § 10310(c)(1) (formerly 42 U.S.C. § 1973*l*). . . ." *Id.* In rejecting Texas' interpretation the court said "'[t]o vote,' . . . plainly contemplates more than the mechanical act of filling out the ballot sheet. It includes steps in the voting process *before entering* the ballot box, 'registration,' and includes steps in the voting process *after leaving* the ballot box, 'having such ballot counted properly.'" *Id.* at 615 (emphasis in original). The court reasoned that "a state cannot restrict this federally guaranteed right by enacting a statute

16

tracking its language, then defining terms more restrictively than as federally defined." *Id.* As a result, the court said "[w]e must conclude that the limitation on voter choice *expressed in Tex. Elec. Code § 61.033* impermissibly narrows the right guaranteed by Section 208 of the VRA." *Id.* at 615 (emphasis supplied).

But unlike Texas's voter assistance law, S.B. 2358 does not narrow the definition of the term "vote." To be sure, the Fifth Circuit applied the VRA's definition of voting in Section 10310(c)(1) in broad terms which yielded the result as applied to Texas voter assistance law that precluded certain voter assistance activities outside of the voting booth. But *OCA-Greater Houston* must be read for what it said – and for what it did not say – and it cannot be construed to categorically prohibit a state statute that creates broad categories of those "persons who may assist voters. . . ." *Nessel*, 2022 WL 4272299 at *10.[4]

The proper reading of Section 208 with respect to state voter assistance laws was addressed in *Priorities USA v. Nessel*. In that case, plaintiffs challenged Michigan's voter assistance law under Section 208. See *Nessel*, 2022 WL 4272299 at *1. The district court upheld Michigan's law which identified those individuals who could assist voters under Section 208. *Id.* at *10-11. Section 759 of Michigan's Absentee Ballot Law contained the following exceptions: "a member of the applicant's immediate family; a person residing in

---

[4] Plaintiffs cite *La Union del Puebelo Entero v. Abbott*, 604 F. Supp. 3d 512, 533-34 (W.D. Tex. 2022). First, the Texas assistor provision required individuals to take an oath confining their assistance to certain activities. *Id.* at 533-34. S.B. 2358 does not contain this limiting language or oath requirement. Further *La Union's* reliance on *OCA-Greater Houston* relates to the definition of the term "to vote" under Section 20310(c)(1) of the VRA. This issue has already been addressed by the State Defendants, *supra*, pp. 15-17. Finally, the Court acknowledged that the United States did not bring a claim against Texas for this portion of its voter assistance law. 604 F. Supp. 3d at 534 n.16 ( "The United States has not expressly alleged that § 208 "preempts" section 6.04."). *Id.*

the applicant's household; a person whose job normally includes the handling of mail . . . ; a registered elector requested by the applicant to return the application; or a clerk, assistant of the clerk, or other authorized election official." *Nessel*, at *11 (quoting Mich. Comp. Laws § 168.759(4)); *see also Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020) ("Congress's language choice must be given meaning and here, where it has declined to use a definite article, its language suggests that some state law limitations on the identity of persons who may assist voters is permissible."); *see also Ray v. Texas*, 2008 WL 3457021 at *7 (E.D. Tex. Aug 7, 2008) ("The legislative history [of § 208] evidences an intent to allow the voter to choose *a* person whom the voter trusts to provide assistance. It does not preclude all efforts by the State to regulate elections by limiting the available choices to certain individuals") (emphasis in original).

In *Nessel*, the plaintiffs argued that Michigan's absentee-ballot law conflicted with Section 208. 2022 WL 4272299 at *10. They argued the law "'unlawfully limits the right afforded to voters by Section 208 by prohibiting voters who need help returning their absentee ballot applications from receiving assistance from the person of their choice.'" *Id.* In construing Section 208, the court said the VRA allows "certain voters who need help voting to select '*a* person of the voter's choice' – not '*any* person,' not '*the* person.'" *Id.* (citing 52 U.S.C. § 10508) (emphasis original) (citing *Priorities USA*, 487 F. Supp. 3d at 619).

The court reasoned that Congress used the indefinite article ("a") which is "'non-specific and non-limiting, as opposed to the definite article' ("the"), which 'is specific and limiting.'" *Id.* at *10. Accordingly, "[w]hen Congress 'has declined to use a definite article, its language suggests that some state law limitations on the identity of persons who may

18

assist voters is permissible.'" *Id.* at *10 (quoting *Priorities USA*, 487 F. Supp. 3d at 619).

Thus, "[a]t its core, Section 208's natural effect allows some wiggle room: a voter may select

'a person' to assist them, but not *the* person of their choice." *Id.* at * 11. The court concluded

that "the two laws are harmonious and the VRA does not preempt the absentee-ballot

law." *Id.* at *11.

The legislative history from the United States Senate Judiciary Committee Report

regarding Section 208 supports *Nessel's* view:

> *State provisions would be preempted only to the extent that they unduly burden*
> *the right recognized in this section*, with that determination being a practical
> one dependent upon the facts. Thus, for example, a procedure could not deny
> the assistance at some stages of the voting process during which assistance
> was needed, nor could it provide that a person could be denied assistance
> solely because he could read or write his own name.

S. Rep. 97-417, p. 241 (1982) (emphasis supplied). The Committee also "recognize[ed] the

legitimate right of any state to establish necessary election procedures, subject to the

overriding principle that such procedure should be designed to protect the rights of voters."

S. Rep. 97-417, p. 241 (1982). This language again supports the view that states are not

powerless to implement laws that touch on but do not conflict with Section 208. S.B. 2358

is just such an enactment that can be harmonized with Section 208.

Twelve years before *Nessel*, the district court in *Ray v. Texas*, rejected a challenge

to a state law making it a criminal offense to sign as a witness for more than one early

voting ballot application, subject to certain exceptions. 2008 WL 3457021, at * 1 (citing

Tex. Elec. Code § 84.004). The *Ray* plaintiffs argued Section 208 must be read that "a

person of the voter's choice" means "that the voter may choose *any* person, without

limitation." *Id.* at *7 (emphasis original). The district court rejected plaintiffs' preferred

reading and said "[t]he language of Section 208 allows the voter to choose a person who will assist the voter, but it does not grant the voter the right to make a choice without limitation." *Id.* The district court buttressed this conclusion with the legislative history that "evidences an intent to allow the voter to choose *a* person whom the voter trusts to provide assistance. It does not preclude all efforts by the State to regulate elections by limiting the available choices to certain individuals." 2008 WL 3457021 at *7 (emphasis in original); *see supra*, S. Rep. 97-417, p. 241.

Finally, *Ray* concluded that the restriction on who may assist a voter is "reasonable in view of the State's goal of reducing the type of election fraud addressed by § 84.004. The statute is not preempted by Section 208." *Id.* at * 7; *see also Qualkinbush v. Skubisz*, 826 N.E. 2d 1181, 1196 (Ill. 2004) (restriction on those individuals who may return a disabled voter's absentee ballot does not conflict with Section 208 of the VRA); *DiPietrae v. City of Philadelphia*, 666 A.2d 1132, 1133 (Penn. 1995) (upholding a Pennsylvania law limiting the persons for whom individuals may act as agents to obtain absentee ballot applications, deliver ballot applications, obtain absentee ballots, or deliver completed absentee ballots).

Plaintiffs also press the argument that "principles of statutory interpretation confirm the Fifth Circuit's interpretation of Section 208." [Doc. 3 at 15]. Here they say that "[w]hen Congress 'explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent.'" (quoting *Hillman v. Miretta*, 569 U.S. 483, 496 (2013) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)). *Nessel* rejected this stance that Section 208 provides for the only exclusion to voter assistance, namely "'the voter's employer or agent of that

employer or officer or agent of the voter's union.'" 2022 WL 4272299 at *11. And the *Nessel* plaintiffs unsuccessfully invoked *Andrus. See Plaintiffs' Memorandum in Opposition to Intervenor-Defendants' Motion for Judgment on the Pleadings*, Case 2:19-cv-13341-SJM-KGA, ECF No. 121, Page ID. 1989-1990, p.30. The district court in *Nessel* reiterated that "Congress agreed to use an indefinite article, meaning that the persons identified in Section 208 do not constitute an exhaustive or exclusionary list." *Nessel*, at *11.

**(2)     The cases cited by plaintiffs are not persuasive.**

Plaintiffs cite several cases which they suggest spell doom for S.B. 2358 under Section 208. [Doc. 3 at 16]. While these decisions are elucidating as to the statutes in those states, the decisions do not dispense the unilateral remedy sought by plaintiffs relative to Section 208 and S.B. 2358. In fact, several decisions cited by plaintiffs further support the point that states have some flexibility under Section 208 in crafting who may assist voters.

In *Disability Rights North Carolina v. North Carolina State Board of Elections*, 602 F. Supp. 3d 872 (E.D.N.C. 2022), the plaintiffs challenged a North Carolina law that placed far greater restrictions on who could assist voters living in facilities such as clinics, hospitals, and nursing homes from relying on persons associated with those facilities for voting assistance. *Id.* at 875. Specifically, plaintiff alleged that North Carolina laws prohibit voters with disabilities living in facilities like clinics, hospitals, and nursing homes from relying on any person associated with those facilities for assistance with any of the steps required to vote absentee. The court concluded that "the plain language of this provision appears to impermissibly narrow the right to assistance by a person of the voter's

21

choice *by prohibiting the mailing or delivery of a voter's ballot by anyone except a near relative or legal guardian.*" *Id*. at 879 (emphasis supplied).

Unlike the North Carolina law, S.B. 2358 specifically allows a "caregiver" to collect and transmit a ballot. *See* S.B. 2358(1)(d). Thus, *Disability Rights North Carolina* does not advance plaintiffs' argument. DRMS says the term caregiver as not being defined in SB 2358. [Doc. 3-2 (¶ 17)]. But "[w]hen faced with an undefined statutory term, [the court's] job is to apply the 'common, ordinary meaning'" of the term. *Camacho v. Ford Motor Co.*, 993 F.3d 308, 312 (5th Cir. 2021) (citation omitted) "To do that, '[the court] may consider a variety of sources, including dictionary definitions, judicial constructions of the term, and other statutory definitions." *Id.* (citation omitted).

Plaintiffs also cite *Democracy North Carolina v. North Carolina State Board of Elections*, 476 F. Supp. 3d 158 (M.D. N.C. 2020) where the court enjoined North Carolina's law for transmitting an absentee ballot to a county board of elections. *Id.* at 235. Under that law, ballots could only be transmitted to the county board of elections by mail or commercial courier service, by the voter, or the voter's near relative. *Id*. The law also prohibited anyone but the voter's near relative or legal guardian from "'tak[ing] into possession that person's possession for delivery to a voter or for return to a county board of elections the absentee ballot of any voter.'" *Id.*

The court said this law "impermissibly restrict[ed] who may assist [Section] 208-voters who are patients 'in any hospital, clinic, nursing home or rest home. . . .'" *Id.* SB 2358's caregiver provision distinguishes the law from the North Carolina provision. Again, S.B. 2358 authorizes a caregiver to collect and transmit a ballot. Significantly, while

*Democracy North Carolina* sought to distinguish *Ray v. Texas*, the court nonetheless acknowledged some limitations under Section 208 are permissible. The court said, "in *Ray, only a few people were off-limits to voters*, leaving nearly everyone else available to witness an absentee ballot, whereas here, everyone but a few people are off limits." *Id.* at 236 (emphasis supplied). The inescapable conclusion is that Section 208, properly construed, gives a state latitude.

Plaintiffs' reliance on *Arkansas United v. Thurston*, 2022 WL 4097988 (W.D. Ark Sept. 7, 2022), is also misplaced. In *Thurston*, the court enjoined Arkansas' six-voter limit on the number of individuals a person could assist in the voting process. *Id.* at 16. Unlike Arkansas voter assistance provision, S.B. 2358 does not impose such a limitation. *See* S.B. 2358(1)(a) – (e). Thus, exempt persons under S.B. 2358 are not limited in the number individuals for whom they may collect and transmit ballots.

*Thurston* rebuffed the state's reliance on *Ray v. Texas,* but the court did so based on a faulty premise. The *Thurston* court noted that *Ray* predated *OCA-Greater Houston* and that the Fifth Circuit construed Section 208 more broadly that did *Ray. Id.* at 17, n.15. But *Thurston* was only partially correct in that *Ray* did predate *OCA-Greater Houston*. As noted previously, although *OCA-Greater Houston* gave broad meaning to the VRA's definition of the term "to vote," *see supra* at 15-17, that decision did not address the challenge brought today by plaintiffs. *See* 587 F.3d at 614. *OCA-Greater Houston* cannot be read in such sweeping and *Thurston's* rejection of *Ray* is not persuasive.[5]

---

[5] *OCA-Greater Houston* did not reference *Ray*.

Plaintiffs' reliance on *Carey v. Wisconsin Election Commission*, 624 F. Supp. 3d 1020 (W.D. Wis.) is also unavailing. In the lead-up to *Carey*, the Wisconsin Supreme Court decided *Teigen v. Wisconsin Election Commission*, 976 N.W.2d 519 (Wis. 2022). In *Teigen*, the court held that Wisconsin state law prohibited voters from obtaining assistance from a third-party to return an absentee ballot to the municipal clerk. *Id.* The *Teigen* Court held that "'the voter must personally deliver' [an absentee ballot] to the municipal clerk." *Teigen*, 976 N.W.2d at 525 (¶ 4). The court in *Carey* easily concluded that the VRA preempted Wisconsin's statute, affirmed by *Teigen* "to the extent it prohibit[ed] third-party ballot return assistance to disabled voters who require such assistance." *Carey*, 624 F. Supp. 3d at 1033. S.B. 2358 does not prohibit third-party ballot return assistance but specifically provides for such assistance.

Plaintiffs' reliance on *U.S. v. Berks County, Penn.*, 277 F. Supp. 2d 570 (E.D. Penn. 2003), suffers from the fact that the court deviated from the language of Section 208, stating that "[t]he voter *may choose anyone* to provide assistance as long as the assistor is not the voter's employer or union officer or agent of the voter's employer or union." *Id.* at 584 (citing 52 U.S.C. 1058, formerly 42 U.S.C. § 1973aa–6) (emphasis supplied); *Cf. Priorities USA*, 487 F. Supp. 3d at 619. Section 208 does not use the term "anyone." The *Berks County* decision was not faithful to the text of Section 208.

*Pierce v. Allegheny Cnty. Bd. of Elections*, 324 F. Supp. 2d 684, 690 (W.D. Penn. 2003), likewise does not advance plaintiffs' preferred interpretation of Section 208. The court in *Pierce* addressed three policies issued by the Pennsylvania State Board of Elections. The court concluded that the second policy precluded third-party hand-

24

delivery of absentee ballots. *Id.* at 690. Accordingly, that limitation was inconsistent with Section 208 as well as the state court decision in *DiPietrae*, 666 A.2d at 1135.

In *DiPietrae*, the court confirmed that a disabled voter could appoint a person to obtain an absentee ballot application, to deliver it to the Election Board, to obtain an absentee ballot from the Board and to deliver the completed ballot either to the mail-box or to the Board. However, the court also affirmed the proviso that "an individual cannot be the agent for persons living in more than one household" as a reasonable means of balancing the rights of a disabled person who wishes to vote with the public need to ensure a fair election. *DiPietrae*, 666 A.2d 1135–36 (Pa. Commw. Ct. 1995), *aff'd,* 543 Pa. 591, 673 A.2d 905 (1996). This again confirms that states have breathing room under Section 208. *Priorities USA*, 487 F. Supp. 3d at 619.

Plaintiffs finally cite *Am. Ass'n of People with Disabilities v. Hood*, 278 F. Supp. 2d 1345 (M.D. Fla. 2003). In *Hood*, the court examined the contours of Section 208 vis-à-vis Title II of the American's With Disabilities Act: "[t]he application of the ADA in the manner sought by Plaintiffs would not limit or invalidate the rights provided under the VRA or the [Voting Accessibility for the Elderly and Handicapped Act]." *Id.* at 1355. The court said the "VRA provides disabled voters who require assistance the right to have a person of their choice assist them (subject to exceptions)." *Id.* at 1356.

In the end, *Nessel*, *Ray*, and the legislative history underpinning Section 208 confirm that Section 208, properly construed, allows the voter to choose a person who will assist them, but it does not grant the voter "the right to make that choice without limitation." *Ray*, 2008 WL 3457021 at *7. And while courts have certainly invalidated

certain limitations on voter assistance laws, S.B. 2358 does not create impermissible limitations. Plaintiffs cannot demonstrate a likelihood of success on the merits of their Section 208 claim and the motion should be denied.

## II.    Certain Plaintiffs cannot demonstrate irreparable harm.

The mere "possibility" of irreparable injury does not support preliminary injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Rather, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original). As set forth *supra*, the organizational plaintiffs lack standing and therefore cannot demonstrate the irreparable harm prong of the inquiry. DRMS argues that S.B. 2358 would cause it irreparable harm "because many of their constituents—Mississippi voters with disabilities—will be disenfranchised." [Doc. 3], p. 19. This is a conclusory allegation not supported by any evidence. The same is true for LWV-MS, which merely alleges that the law "frustrates [its] mission." *Id.* at p. 20. This vague assertion of irreparable harm is insufficient to satisfy the second element of the preliminary injunction analysis.

## III.   The harm to the State in granting an injunction far exceeds any harm to plaintiffs, and the public interest favors denying plaintiffs' motion.

"'A State indisputably has a compelling interest in preserving the integrity of its election process.'" *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.,* 489 U.S. 214, 231 (1989)). The Supreme Court has reiterated that confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. *Id.* "Voter fraud drives honest citizens out of

26

the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Id.*

As noted above, the balance of the equities and the public interest merge and are considered together when the government is the opposing party. *Pacharne v. Dep't of Homeland Sec.*, 565 F. Supp. 3d at 802 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Those features strongly weigh against a preliminary injunction in this case. First, S.B. 2358 is a duly-enacted law of the Mississippi Legislature—*viz.*, the people's representatives. The law inherently reflects the will of the people of the State of Mississippi. The State is harmed any time that will is enjoined by a federal court on behalf of a handful of individual plaintiffs who are unhappy with the actions of the Legislature. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State").

## IV.   Any injunction should be limited in scope and to the individual plaintiffs.

While injunctive relief should be denied for the reasons set forth, any equitable relief, if granted, must be narrow in scope and limited to the named individual plaintiffs. Because the organizational plaintiffs lack standing, injunctive relief should be denied as to them entirely. However, even if the organizational plaintiffs have standing, the relief should be limited to the enforcement of S.B. 2358. The sweeping and overly broad relief in paragraphs two (2) and three (3) of the motion [Doc. 2 (¶¶ 2, 3)] should be denied. Respectfully, this Court cannot order the Attorney General or the Secretary of State to issue any statements regarding S.B. 2358. Such an injunction would be improper even if

the Court temporarily enjoined S.B. 2358's enforcement. *OCA-Greater Houston*, 867 F.3d at 615 (vacating district court's injunction as overbroad and vague).

As a general rule, federal courts lack the authority to enter so-called "universal" injunctions that preclude enforcement of a law against all persons, rather than against only the named plaintiffs. Under Article III of the U.S. Constitution, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). *See also Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 478 n.39 (5th Cir. 2020) ("court must narrowly tailor an injunction to remedy the specific action which gives rise to the order"). "Standing is not dispensed in gross," a plaintiff "must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352-53 (2006).

In the same vein, "[e]quitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). *See also Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (quoting with approval *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring)). Injunctions that afford relief to "those who are strangers to the suit" thus "raise serious questions about the scope of courts' equitable powers under Article III." *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring). "After a court has remedied a claimant's injury, it is fair to ask what controversy remains for a court to adjudicate or remedy." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring).

At least three reasons warrant limiting the scope of any injunctive relief. First the organizational plaintiffs lack standing and are not entitled to injunctive relief. Second, this is not a class action, nor do plaintiffs seek to make it one. Third, rules of equity independently require that "[a]s a general principle, injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)) (internal quotation marks omitted); *Robinson v. Ardoin*, 37 F.4th 208, 232 (5th Cir. 2022) (same).

This principle applies with even greater force to a preliminary injunction, which is an equitable tool intended "merely to preserve the relative positions of the parties" while litigation is pending. *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (internal quotation marks omitted). Furthermore, the equitable jurisdiction of federal courts is grounded in historical practice, yet universal injunctions are a modern invention. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2424-2429 (2018) (Thomas, J., concurring) (maintaining that universal injunctions "appear to be inconsistent with longstanding limits on equitable relief and the power of Article III courts" and questioning their historical pedigree).

Finally, the law already provides a way to afford relief beyond named plaintiffs: the class action mechanism. But class relief is proper only when FED. R. CIV. P. 23's rigorous requirements are satisfied. Universal injunctions can give third parties the benefits of class relief without satisfying FRCP 23. Courts should avoid "sidestep[ping] Rule 23's requirements." *Arizona*, 40 F.4th at 396 (Sutton, C.J., concurring).

29

Plaintiffs cannot demand any more than that, especially since they have not sought class treatment. For all these reasons, any preliminary injunction awarded should be limited in scope and in particular should not encompass the mandatory relief regarding defendants issuing "instructions or communications." [Doc. 2 (¶ 3)]. The State Defendants submit that any broader injunction would exceed the bounds of this Court's jurisdiction under Article III and the traditional limitations of equitable relief.

## CONCLUSION

For the reasons set forth, plaintiffs' motion for preliminary injunction should be denied in its entirety. Alternatively, if the Court is inclined to grant a preliminary injunction, it should be limited to the named individual plaintiffs and be confined to the enforcement of S.B. 2358 – nothing more.

THIS the 10th day of June, 2023.

> Respectfully submitted,
>
> LYNN FITCH, in her official capacity as Attorney General of Mississippi, and MICHAEL D. WATSON, JR., in his official capacity as Secretary of State of Mississippi
>
> By:   LYNN FITCH, ATTORNEY GENERAL FOR THE STATE OF MISSISSIPPI
>
> By:   s/Douglas T. Miracle
>       DOUGLAS T. MIRACLE (MSB # 9648)
>       Assistant Attorney General

DOUGLAS T. MIRACLE (MSB # 9648)
GERALD L. KUCIA (MSB # 8716)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-5654
doug.miracle@ago.ms.gov.
gerald.kucia@ago.ms.gov

ATTORNEY FOR DEFENDANTS

LYNN FITCH, in her official capacity
as Attorney General of Mississippi,
and MICHAEL D. WATSON, JR.,
in his official capacity as Secretary
of State of Mississippi

## <u>CERTIFICATE OF SERVICE</u>

I, Douglas T. Miracle, Assistant Attorney General and one of the attorneys for the above-named defendants, do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 10th day of June, 2023.

s/Douglas T. Miracle
Douglas T. Miracle