UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


DISABILITY RIGHTS MISSISSIPPI, et al.        PLAINTIFFS

v.                              CIVIL ACTION NO: 3:23cv350

LYNN FITCH, in her official
capacity as Attorney General
of the State of Mississippi, et al.         DEFENDANTS



TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION


TUESDAY, JUNE 13, 2023

BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE


COURT REPORTER:

Fred W. Jeske, RMR, CRR
701 North Main Street, Suite 228
Hattiesburg, Mississippi  39401
(601) 255-6432
fred_jeske@mssd.uscourts.gov

1        APPEARANCES:

2        REPRESENTING THE PLAINTIFFS:

3            JOSHUA TOM, ESQUIRE
             CLAUDIA WILLIAMS HYMAN, ESQUIRE
4            101 South Congress Street
             Jackson, MS  39201
5            601/354-3408
             jtom@aclu-ms.org
6            cwilliamshyman@aclu-ms.org

7
             AHMED SOUSSI, ESQUIRE
8            BRADLEY E. HEARD, ESQUIRE
             SABRINA KHAN, ESQUIRE
9            Southern Poverty Law Center
             150 East Ponce de Leon Avenue, Suite 340
10           Decatur, GA  30030
             334/213-8303
11           ahmed.soussi@splcenter.org
             bradley.heard@splcenter.org
12           sabrina.khan@splcenter.org

13           LESLIE FAITH JONES, ESQUIRE
             Southern Poverty Law Center
14           111 East Capitol Street, Suite 280
             Jackson, MS  39201
15           601/948-8882
             leslie.jones@splcenter.org
16
             MING CHEUNG, ESQUIRE
17           CASEY SMITH, ESQUIRE
             American Civil Liberties Union Foundation
18           125 Broad Street, 18th Floor
             New York, New York  10004
19           212/549-2500
             mcheung@aclu.org
20           csmith@aclu.org

21           ROBERT McDUFF, ESQUIRE
             Mississippi Center for Justice
22           210 East Capitol Street, Suite 1800
             Jackson, MS  39201
23           601/259-8484
             rmcduff@mscenterforjustice.org

24

25

1          APPEARANCES CONTINUING:

2          REPRESENTING THE DEFENDANTS:

3                  DOUGLAS T. MIRACLE, ESQUIRE
                   GERALD L. KUCIA, ESQUIRE
4                  Mississippi Attorney General's Office
                   550 High Street, Suite 1200
5                  Jackson, MS  n39201
                   601/359-5654
6                  doug.miracle@ago.ms.gov
                   gerald.kucia@ago.ms.gov
7
           FOR DEFENDANT MUMFORD: (Excused)
8
                   GERALD A. MUMFORD, ESQUIRE
9                  Hinds County Attorney

10

11                                 -oOo-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Good morning.  Please be seated.

4              Terri, call the case.

5              THE CLERK:  Your Honor, this is Disability Rights

6   Mississippi, et al. versus Lynn Fitch, et al., Civil Action No.

7   3:23cv320 HTW-LGI.  We are here for a motion for preliminary

8   injunction.  And at this time I'm going to ask all the parties

9   to introduce themselves for the record, starting with

10  plaintiff.

11             MR. SOUSSI:  Good morning, Ahmed Soussi on behalf of

12  the plaintiffs.

13             THE COURT:  All right.  Good morning to you.

14             MR. HEARD:  Good morning, Your Honor.  Bradley Heard

15  on behalf of the plaintiffs.

16             THE COURT:  Thank you.

17             MS. JONES:  Good morning, sir.  Leslie Faith Jones on

18  behalf of the plaintiffs.

19             THE COURT:  Good morning to you.

20             MR. CHEUNG:  Good morning, Your Honor, Ming Cheung.

21             THE COURT:  All right.  Good morning.

22             MS. HYMAN:  Good morning, Your Honor.  Claudia

23  Williams Hyman for the plaintiffs.

24             THE COURT:  Good morning.

25             MS. SMITH:  Good morning, Your Honor.  Casey Smith

1    for the plaintiffs.

2              THE COURT:  Good morning.

3              MR. TOM:  Good morning, Your Honor.  Joshua Tom for

4    the plaintiffs.

5              THE COURT:  Good morning.

6              MR. McDUFF:  Good morning, Your Honor.  Rob McDuff

7    for the plaintiffs.

8              THE COURT:  Good morning.

9              Robb, they couldn't squeeze you in up here?

10             MR. McDUFF:   I prefer to sit on the back row and out

11   of sight.

12             THE COURT:  All right, Mr. McDuff.  Good to see you.

13             Next?  Over to the defense.

14             MR. MIRACLE:  Good morning, Your Honor.  Doug Miracle

15   from the Attorney General's Office on behalf of Attorney

16   General Lynn Fitch and Secretary of State Michael Watson, both

17   in their official capacities, and Gerald Kucia from the

18   Attorney General's Office on behalf of the same state

19   defendants.

20             THE COURT:  All right.

21             MR. KUCIA:  Good morning, Your Honor.

22             THE COURT:  Good morning, Mr. Kucia.

23             Now, do you all feel outnumbered?

24             MR. MIRACLE:  Just a little bit, Your Honor.

25             A trend, Your Honor.

1          THE COURT:  All right.

2          All right, good morning, Mr. Mumford.

3          MR. MUMFORD:  Representing myself, asking to be

4     excused.

5          THE COURT:  I've had a conversation with my people

6     about you and so I will get back to you in just a second.

7          Is there anybody else?

8          Well, I guess not.  I guess I'll start with you right

9     now.

10          Mr. Mumford, you contend that you are a nominal party

11     and that you do not intend to play any role today and you do

12     have duties pursuant to your -- your duties as a county

13     attorney and you are asking to be excused so you can go about

14     your duties.

15          I'm inclined to agree to excuse you unless I hear

16     some strenuous objection from anybody.

17          So let me start over here with the plaintiff.  Is

18     there any objection to Mr. Mumford being released today?

19          MR. SOUSSI:  No, Your Honor.  We have no objection.

20     Just ask that whatever the ruling is, he is bound by it.

21          THE COURT:  Mr. Mumford, you don't have any problem

22     with that, do you?

23          MR. MUMFORD:  No, Your Honor.

24          THE COURT:  Okay.  And then what about the defense?

25          Thank you so much.

1              MR. MUMFORD:  Thank you.

2              THE COURT:  What about the defense?

3              MR. MIRACLE:  No objection, Your Honor.

4              THE COURT:  All right.  Then, Mr. Mumford, then you

5    are free to go about your duties today, but if there is some

6    ruling which embraces you, then I suggest that the parties

7    contact you to let you know what that is so that you would know

8    if you want to be bound by it.  Otherwise you would be bound by

9    it.  All right.

10             MR. MUMFORD:  Yes, Your Honor.

11             THE COURT:  So then you can be excused.  Thank you so

12   much.

13             What brings us here this morning is a motion by the

14   plaintiff for a motion for a preliminary injunction.  Who would

15   be making the argument on behalf of the plaintiffs?

16             MR. SOUSSI:  I will be, Your Honor.

17             THE COURT:  All right.  And prior to making your

18   arguments I need to know whether you are going to provide any

19   additional supplementation relative to any matters of evidence.

20             Do you intend to call any witnesses?

21             MR. SOUSSI:  No, Your Honor.

22             THE COURT:  Any more documents that you wish to

23   submit to the court?

24             MR. SOUSSI:  No, Your Honor.

25             THE COURT:  Are you ready to make your argument?

1          MR. SOUSSI:  Yes, I am, Your Honor.

2          THE COURT:  How much time do you need?

3          MR. SOUSSI:  Fifteen minutes, Your Honor.

4          THE COURT:  You sure 15 minutes is enough?

5          MR. SOUSSI:  Yes, Your Honor, 15 minutes, and then a

6   couple minutes for rebuttal if that's okay.

7          THE COURT:  All right.  Now, if you need more than 15

8   minutes, let me know.

9          MR. SOUSSI:  Yes, Your Honor.

10          THE COURT:  And because whatever time that the court

11   provides to you will be provided to the other side.

12          I have read your submission, but still you need to

13   make your record.

14          MR. SOUSSI:  Yes, Your Honor.

15          THE COURT:  All right.  Go to the podium.

16          MR. SOUSSI:  Good morning, and may it please the

17   court.

18          My name is Ahmed Soussi and I have the honor of

19   representing the plaintiffs in this matter.

20          Your Honor, we're here today seeking to enjoin Senate

21   Bill 2358, which is scheduled to go into effect July 1, because

22   if it were to be allowed to go into effect, it has the

23   potential to disenfranchise thousands of voters who plan to

24   vote by mail in the upcoming primary election.

25          Your Honor, Section 208 of the Voting Rights Act

1    guarantees that voters with disabilities --

2              THE COURT:  Now, counsel, could you slow down just

3    some?

4              MR. SOUSSI:  Yes, Your Honor.

5              THE COURT:  And just take your time.  We have plenty

6    of time today.

7              MR. SOUSSI:  Yes, Your Honor.

8              THE COURT:  You all are the only thing on my calendar

9    today, so you can take your time.

10             MR. SOUSSI:  Yes, Your Honor.

11             THE COURT:  All right.  Go right ahead.

12             MR. SOUSSI:  Thank you, Your Honor.

13             Section 208 of the Voting Rights Act guarantees that

14   voters with disabilities are able to select anyone other than

15   their employer or union representative to assist them in the

16   return of their ballot.  The reason why voters have such a wide

17   ranging choice is because Congress said that's the only way to

18   guarantee that a voter with disabilities is able to effectuate

19   the right to vote is to have them select the person of their

20   choice.

21             However, Mississippi has recently passed Senate Bill

22   2358 which criminalizes this act of returning a ballot.  If

23   this court were not to enjoin Senate Bill 2358, friends,

24   neighbors, anyone the voter selects who doesn't meet one of the

25   few exceptions of Senate Bill 2358 will be subject to one year

1    in county jail or up to a $3,000 fine.

2              This creates a conflict with federal law, Your Honor.

3    And federal law preempts conflicting state law.

4              The question in front of the court today is whether

5    Senate Bill 2358 should be enjoined.  The answer is yes,

6    because the Fifth Circuit with text and the purpose of

7    Section 208 all demonstrate clearly that plaintiffs will

8    succeed on the merits.

9              Additionally, Your Honor, the remaining injunction

10   factors all favor the plaintiffs as well.  For those reasons,

11   Your Honor, we ask this court to grant plaintiffs' motion.

12             Beginning with the success of the merits, Your Honor,

13   under the supremacy clause state laws that conflict -- state

14   laws conflict with federal law when they are an obstacle to the

15   accomplishment and execution of the full purposes and

16   objectives of Congress.

17             The Fifth Circuit has already answered when state

18   laws conflict with Section 208.  In OCA-Greater Houston versus

19   Texas the Fifth Circuit held that state laws that conflict --

20   that impermissibly narrow a voter's choice conflict with

21   Section 208.  This is exactly what Senate Bill 2358 does and

22   plaintiffs demonstrate the real life example of this.

23             For example, plaintiff, Mr. William Earl Whitley, is

24   a Vietnam war vet who lost both of his legs due to his service

25   in the war.  Mr. Whitley is often unable to get his mail.  He

1    relies on friends and neighbors, two groups of people who would

2    be -- who would meet the exceptions of Senate Bill 2358.

3         In the 2022 election, Mr. Whitley relied on his

4    friend, plaintiff Ms. Yvonne Gunn, to return his ballot.  And

5    he wants to have his friend return his ballot again for this

6    upcoming election but now fears because she doesn't meet one of

7    the few exceptions, he will be unable to vote.

8         His choice has been impermissibly narrowed.

9         THE COURT:  You name some other persons in your

10   papers who have relied upon others who performed the same chore

11   you just mentioned.  Are any of those persons present here

12   today in court?

13        MR. SOUSSI:  No, Your Honor, because -- or our

14   organizational plaintiff, yes, Your Honor, we have

15   representatives from our organizational plaintiffs.  The

16   individuals were unable to come.  All of them are in Chickasaw

17   County and they are listening on now on the phone line, though.

18        THE COURT:  All right then.

19        Continue your argument.

20        MR. SOUSSI:  Yes, Your Honor.  Thank you.

21        Your Honor, not only is the Fifth Circuit clear but

22   the plain text as well.  Section 208 guarantees that a voter

23   with a disability may be able to be given assistance by a

24   person of their choice other than just two restrictions, their

25   employer and union representative.

1    If Congress wanted to limit the voter's choice any

2 more, it could have done so, but it didn't.  And that goes back

3 to what that clear purpose of the only way to effectuate a

4 voter with a disability their right is to allow them to select

5 the person they trust to return their ballot.

6    Another example, as we said, was Ms. Cunningham, who

7 is a plaintiff in this matter.  Ms. Cunningham has been a

8 voting rights advocate for the last 60 years in Chickasaw

9 County.  She ensures that voters in her community are able to

10 vote.  She's the one who told Mr. Whitley that he was eligible

11 to vote by mail.  However, because she doesn't meet the

12 exception for S.B. 2358, she now fears that if she continues to

13 do this work, she'll be prosecuted.

14    And even for the voters she may meet the exceptions

15 for, she still feels that she'll be prosecuted because the

16 terms are not defined.  Senate Bill 2358 creates exceptions for

17 a voter's family member, household member or caregiver.

18 However, like I said, the terms aren't defined.

19    One of the people Ms. Cunningham assists is

20 Ms. Elise.  And Ms. Elise is Ms. Cunningham's second half

21 cousin.  Ms. Cunningham doesn't know if a family member is

22 going to be that broad, so she fears that she'll be unable to

23 assist her, and Ms. Elise told Ms. Cunningham that if it wasn't

24 her sending her ballot in, she wouldn't vote.  Thus Senate Bill

25 2358 criminalizes Ms. Cunningham for doing something that the

1    federal law Section 208 guarantees her to do.

2            Additionally, Your Honor, as I said, Disability

3    Rights Mississippi is here, and they are the protection and

4    advocacy agency for the state.  They represent the interests of

5    all Mississippians with disabilities.  They fear that because

6    "caregiver" is not defined that voters who are in congregate

7    facilities would often have to rely on staff members to send

8    back their mail out of an abundance of caution did not actually

9    send back those ballots because they would be subject to

10   criminal prosecution.  Senate Bill 2358 silences their voices

11   as well.

12           The defense only relies on an outlier case to try to

13   tell this court that the Fifth Circuit isn't binding.

14           First of all, that isn't correct, as we clearly --

15           THE COURT:  Before we get to that case, you are

16   telling me that there is no definition of "caregiver."  The

17   defense in their papers submitted a definition.  So do you

18   accept that definition?

19           MR. SOUSSI:  No, Your Honor, that def -- there is

20   no -- there is nothing in the record that states that the

21   legislature intended that to be the definition.

22           Even if that was the definition, two -- there are two

23   issues with it.  The first issue is it's not broad enough as

24   208 guarantees that a voter gets to select anyone.  And this

25   goes back to OCA-Greater Houston, which is binding precedent,

1    that says that the state cannot grant someone a federal right

2    but then restrict it and create a narrower right than what's

3    guaranteed.

4          Section 208 says that the only two people a voter

5    cannot select is their employer/union representative.

6          I understand that the caregiver definition has other

7    categories for friend and stuff like that, but as Disability

8    Rights Mississippi declaration --

9          THE COURT:  Slow down just a little.

10         MR. SOUSSI:  All right.  Sorry, Your Honor.

11         THE COURT:  All right.

12         MR. SOUSSI:  All right.  As Disability Rights

13   Mississippi's declaration demonstrates, that in certain

14   facilities it's not just one person actually taking the mail

15   for someone who is living in these facilities.  It's a long

16   chain.  So it's unclear that they would be able to -- be

17   considered a caregiver under this definition.  And that goes

18   back to the chilling effect.

19         With an upcoming election at the end of July, voters

20   are going to have to make a decision if this court doesn't

21   enjoin this law, "Do I risk being prosecuted by doing something

22   federal law guarantees?"

23         And, Your Honor, as I said, not only is OCA clear,

24   but federal courts have shown little tolerance for any

25   narrowing of Section 208, as we cite to our brief.

1          Thus, Your Honor, because the Fifth Circuit, because

2     of the clear text, and the purpose, plaintiffs have

3     demonstrated that they will clearly succeed on the merits and

4     have met their burden.

5          Turning, Your Honor, to the other remaining factors.

6          THE COURT:  So then you are not satisfied with the

7     dictionary definition of "caregiver"?

8          MR. SOUSSI:  We're not -- yes, Your Honor, we're not

9     satisfied with the definition that the defense cites to in

10    their brief.

11         THE COURT:  And you're not satisfied with any other

12    definition that might appear in a dictionary?

13         MR. SOUSSI:  Your Honor, I believe the issue there is

14    what Section 208 guarantees.  It guarantees that the voter may

15    select anyone except two options.

16         So depending on what the definition of "caregiver"

17    is, if it limits by any chance, other than those two

18    restrictions, it's preempted by federal law.  And that goes

19    back to OCA-Greater Houston where a state can't give someone a

20    right but then make it more narrow than federal law guarantees.

21         THE COURT:  So why shouldn't this court accept the

22    definition of "caregiver" as widely viewed?

23         MR. SOUSSI:  So just so I understand, the normal

24    definition, just anyone who returns a ballot or?

25         THE COURT:  So what is, what is your problem with the

1   term "caregiver" in its usual definitional set?

2            MR. SOUSSI:  Sure, Your Honor.

3            So a couple of issues.  The first one is depending on

4   how broad caregiver is, is we don't -- only the voter knows who

5   can assist them.  So there's different categories.

6            So, yes, maybe someone who is a friend who helps

7   people with certain tasks, right?  But if there is a situation

8   where that voter is unable to get a friend and has to just get

9   a complete stranger because that's the only person in their

10  community who can assist them, right?  Depending on what this

11  definition of caregiver is, is it going to take in effect the

12  people who's -- you know, the random stranger.

13           Section 208 guarantees that the voter can pick anyone

14  except two options.  And Congress was -- the reason why

15  Congress made it so like is because they understood that voters

16  with disabilities are the only people themselves know who can

17  they trust to return their ballot.  And that's the issue with

18  that caregiver definition.  And we believe that Section 2 -- or

19  OCA-Greater Houston reflects that a wide-ranging definition of

20  caregiver won't work.

21           In that case, Your Honor, Texas said that an

22  interpreter would not be able -- that an interpreter had to be

23  someone who was a registered voter in the county.  And there

24  the Fifth Circuit said that Texas impermissibly narrowed the

25  definition.

1          Here we have a much -- a restriction that goes far

2     past that.  Someone can eventually become a registered voter.

3     Someone can't become a family member, a household member.

4          And to your point about caregiver, it's the voter's

5     choice.  So if he wants to pick someone random on the street to

6     assist them because that's the only person that they can, that

7     is a right given to the voter.  And we would argue that

8     caregiver doesn't have -- that there is no way to encompass all

9     that.

10          Turning to irreparable harm, Your Honor, the defense

11     don't dispute the irreparable harm towards Mr. Whitley,

12     Ms. Cunningham and Ms. Gunn.  So their arguments to our

13     organizational plaintiffs also fail because they have the same

14     irreparable harm.

15          Disability Rights Mississippi is the, as I said, is

16     the protection and advocacy agency.  They are representing

17     every single voter with a disability in Mississippi which are

18     having their rights restricted by Senate Bill 2358.

19          And for League of Women Voters, they represent all

20     the assisters who fear prosecution.  Thus, their argument for

21     irreparable harm fails.

22          Additionally, the organizations themselves are harmed

23     by this because of the frustration of mission as exhibited in

24     Disability Rights Mississippi's declaration.  They're planning

25     over 40 trainings to be before the August primary to ensure

1   voters understand that if they get assistance from someone who

2   doesn't meet one of the few exceptions, they will be subject to

3   one year in county jail or up to a $3,000 fine.  Thus,

4   plaintiffs have met their burden.

5          To the other two factors, Your Honor, the public

6   interest strongly favors an injunction here because it's in the

7   public's interest to allow as many qualified voters to vote.

8   Because once the election occurs, there can be no do-overs.

9          Additionally, the state isn't injured by not being

10   able to enforce a law that will likely be found to be

11   preempted.  And for the balance of the equities in this

12   situation, the longstanding status quo is to allow people like

13   Ms. Mamie to -- Ms. Cunningham to assist the people in her

14   community.  That's what an injunction would do here.  It will

15   allow people to continue to do what they have been doing, and

16   that was sufficient for the Ninth Circuit in Feldman versus

17   Arizona Secretary of State.

18          Unless the court has any other questions...

19          THE COURT:  Starting with the organizational

20   plaintiffs.  The challenge waged by the defense is that they

21   are not a proper party here.  So why don't you tell me why they

22   are.

23          MR. SOUSSI:  Yes, Your Honor.

24          So both of our organizational plaintiffs have both

25   associational standing and organizational standing.  For

1    Disability Rights Mississippi, they are, as we cite to in our

2    brief, because they're the protection advocacy agency, they

3    have statutory authority to bring claims on behalf of every

4    single person here, every single Mississippi voter with a

5    disability.  That meets the Hunt test sufficiently.

6          And to the question of individualized plaintiffs,

7    that isn't in question here because a preemption claim is a

8    question of law.  There doesn't -- it's about what's the

9    purpose and does it violate the actual -- does it frustrate the

10   mission and objectives?  So there doesn't, there doesn't need

11   to be individual plaintiffs.

12         For League of Women Voters as well to show that they

13   have the right to assist can be seen by Section 208's plain

14   text.  So for associational standing, Your Honor, that's met,

15   no question.

16         And we also ask this court to take notice in our

17   briefs where we cite to Disability Rights North Carolina, which

18   is a sister organization of Disability Rights Mississippi,

19   which just won a similar Section 208 claim with a similar

20   restriction on summary judgment.  And the court there granted

21   an injunction for every single voter with a disability in North

22   Carolina.

23         For organizational standing, as I just mentioned,

24   Disability Rights Mississippi's mission has been frustrated

25   because now when they go into the facilities, instead of the

1  small voting rights presentation that they do, they now have to

2  warn voters about choosing someone who doesn't meet one of the

3  few exceptions because of this high punishment of one year in

4  county jail and a $3,000 fine for doing something that federal

5  law allows them.

6          For the League of Women Voters, Your Honor, they also

7  allege that now they have to --

8          THE COURT:  One second.  Hold on.

9          Fred, do you need me to slow him down some more?

10         MR. SOUSSI:  Sorry, Your Honor.  Sorry.

11         THE COURT:  Okay.

12         MR. SOUSSI:  Sorry.  Sorry.

13         Sorry, Your Honor.

14         THE COURT:  Now, you know he has to make a verbatim

15  record.

16         MR. SOUSSI:  Yes.  Yes, Your Honor.  Yes.  Yeah.

17         THE COURT:  Everything which is being stated here.

18         MR. SOUSSI:  Right.

19         THE COURT:  And from time to time you're getting more

20  excited.

21         MR. SOUSSI:  Sorry, Your Honor.

22         THE COURT:  So could you kind of restrain yourself

23  just a little bit?

24         MR. SOUSSI:  Yes, Your Honor.  Yes, Your Honor.  Last

25  time.  Won't happen again.

1          THE COURT:  All right.  Go ahead.

2          MR. SOUSSI:  So League of Women Voters, Your Honor,

3    have shown that they -- their mission is to educate the voters

4    and get out the vote.  They want to get their members to

5    participate in the electoral process.  Now they have found out

6    that if their members assist voters with disabilities they will

7    be subject to those high punishments of Senate Bill 2358.

8          So what they did is they're now creating new

9    materials to warn their members and the community, which is the

10   exact diversion of resources that the Fifth Circuit said in

11   OCA-Greater Houston that was sufficient.

12         OCA-Greater Houston was an organization that

13   similarly did get out the vote and voter education.  When they

14   found out about Texas's new law limiting interpreters to only

15   registered voters, it started making calls to community members

16   to warn them, to tell them what's -- what -- to warn them about

17   ways not to avoid the law.  This is exactly what League of

18   Women Voters of Mississippi has done here.

19         And the last thing I would say about standing, Your

20   Honor, is this court really needs to find for this matter that

21   they only meet one.

22         We argue they have met both associational and

23   organizational, but all of that needs for this case is just

24   one.  So we meet both of them.

25         Unless the court has any other questions or...

```
1                THE COURT:  All right.  Let's talk about exemptions

2   now.

3                MR. SOUSSI:  Sure.  Yes, Your Honor.

4                THE COURT:  Preemption, I mean.  Preemption.

5                MR. SOUSSI:  Yes, Your Honor.

6                THE COURT:  You've resorted to that term more than

7   once in your address to the court on preemption.  But you would

8   agree with me that the federal enactment does not discuss

9   preemption, does it?

10               MR. SOUSSI:  I apologize, Your Honor?

11               THE COURT:  The federal enactment does not address

12  preemption.

13               MR. SOUSSI:  It addresses preemption in the

14  legislative history, Your Honor.

15               It says that a state will be preempted if it creates

16  an undue burden.  And then they give an example of what an

17  undue burden is.  They say an undue burden is when a voter is

18  unable to get the assistance of their choice.

19               We have shown the court real-life examples of voters

20  who are unable to get that assistance.  And I would also argue,

21  Your Honor, the Fifth Circuit has already answered this

22  question.  They said that Section 208 -- state laws are

23  preempted to Section 208 when they impermissibly narrow a

24  voter's choice.  That's exactly what Senate Bill 2358 does when

25  it tells Mr. William Whitley that he is unable to rely on
```

1   Ms. Gunn to return his ballot.

2           THE COURT:  But the body of the act itself doesn't

3   really respond to a declaration that all state laws are

4   preempted.

5           MR. SOUSSI:  I apologize, Your Honor.  I'm sorry.

6   Can I hear you?

7           THE COURT:  The body of the act does not specify that

8   all state laws are preempted.

9           You find this in legislative history; correct?

10          MR. SOUSSI:  Yes, Your Honor, it's in legislative

11  history.

12          THE COURT:  But you don't find it in the body of the

13  act itself.

14          MR. SOUSSI:  Correct, Your Honor.

15          What I would argue, Your Honor, is that the supremacy

16  clause, those states that federal law preempts conflicting

17  state law.  And Senate Bill 2358 conflicts with the rights that

18  are given to voters here in Mississippi.

19          So even though it doesn't state it in the law,

20  there's still the Constitution.  And I would go back to what

21  the Fifth Circuit did.  It's a similar case here in OCA.  The

22  Fifth Circuit in OCA-Greater Houston said that law is

23  preempted, which is exactly what occurred here.

24          THE COURT:  Okay.  Why don't you look at your note.

25          MR. SOUSSI:  Yes, Your Honor.

1           THE COURT:  Okay.

2           MR. SOUSSI:  Your Honor, additionally, Your Honor,

3   and that's to your question, right?  We're talking today about

4   conflict preemption, which occurs when a state law creates an

5   obstacle to the accomplishment and execution of the full

6   purposes and objectives of Congress.  That's exactly what

7   Senate Bill 2358 does here and that is exactly what the Fifth

8   Circuit struck down in OCA-Greater Houston, and to the multiple

9   courts that we cite to in our brief.

10          Like I said, federal courts have shown little

11  tolerance for any narrowing of Section 208.

12          THE COURT:  Go ahead.

13          Have you looked at your note?

14          MR. SOUSSI:  Yes, Your Honor.  Yes, yes, yes.

15          THE COURT:  Now go ahead.  Is there another part to

16  your argument?

17          MR. SOUSSI:  No, Your Honor.

18          In conclusion, we ask this court to grant this

19  preliminary injunction because the Fifth Circuit, the text and

20  the purpose are all clear that Senate Bill 2358 impermissibly

21  narrows the voter's choice and we ask you to rule for this

22  injunction before the law goes into effect.

23          Thank you, Your Honor.

24          THE COURT:  All right.  Thank you.

25          All right.  Mr. Miracle, I see that you are rising to

1    address the court.  So then I suppose you are going to be the

2    spokesperson for the defense.

3              MR. MIRACLE:  That's correct, Your Honor.

4              THE COURT:  Are you ready to go forward?

5              MR. MIRACLE:  Yes, sir, I am.

6              THE COURT:  All right.  Go ahead.

7              MR. MIRACLE:  Your Honor is obviously well versed in

8    the papers and so I think it would behoove me to address some

9    particular points that counsel opposite and you discussed.  But

10   I would like to start with standing.

11             But before I do that I would like to emphasize with

12   respect to election integrity, that is one of the state's

13   highest duties, to protect the state's election integrity.  The

14   Constitution has reflected that over and over in the case law

15   that grant states broad policymaking in this arena.

16             With that in mind, the legislature passed and the

17   governor signed in March of 2023 the bill that we're here

18   before today, S.B. 2358, which is a ballot harvesting bill.

19   And that is defined by this bill as a person shall not

20   knowingly collect and transmit a ballot that was mailed to

21   another person.  So on its face it's confined to those

22   particular issues.  It does not address any other part of

23   Mississippi Election Code.  Whether the absentee balloting or

24   any of the framework of Mississippi's election code, that is

25   what it's addressed to.

1          As the court has already identified, it creates a

2    number of broad categories of persons who are exempt from this

3    provision.  And we can talk about -- I would like to talk about

4    a little bit later the definitions and what they may encompass

5    and how they integrate with Section 208.

6          But we start with that backdrop, that this is an

7    election integrity bill and the state has a broad interest in

8    protecting that election integrity.

9          THE COURT:  Mr. Miracle.

10         MR. MIRACLE:  Yes.

11         THE COURT:  Oftentimes when a measure is submitted to

12   the court to restrain or to emphasize some particular right,

13   especially relative to voting, there is a section that's

14   spelled out what the violations have been.

15         Is there such a section here?

16         MR. MIRACLE:  That have pointed out what the

17   violations have been?

18         THE COURT:  Yes, that voter or ballot harvesting has

19   been a widespread problem.

20         I didn't -- I don't recall seeing something on that

21   in the briefs.  Is this considered to be some widespread

22   problem in Mississippi on ballot harvesting?

23         MR. MIRACLE:  What I would say to that, Your Honor,

24   and I would be careful in characterizing from my point of view

25   whether it's widespread or not, but I certainly think over

1    the -- over the last several election cycles that has been a

2    concern with respect to -- and I think the general

3    understanding of ballot harvesting is when somebody comes in

4    mass and collects a number of ballots and transports them and

5    is coming in contact with individuals.  Those may be people

6    that are completely unconnected with the voter.

7            I think, generally speaking, and now generally

8    speaking I'm saying this because, to answer your question

9    directly, that is not encompassed in the bill.  There is not a

10   finding, per se, with respect to the question that Your Honor

11   is posing.

12           But what I would say is that with respect to this

13   particular issue, there is a concern, and this goes to the

14   state's protecting the election system from any type of abuse

15   in this regard.

16           Now obviously the type of plaintiff that's before the

17   court today, you know, and the assister who has put

18   declarations before the court today may not fall in that

19   category.  And I think the court has already alluded to or at

20   least is cognizant of, that these individuals probably fit

21   within the exemptions that are within S.B. 2358.

22           It's the people that are not encompassed within this

23   that the ballot harvesting prohibition is obviously geared to,

24   from the integrity standpoint of our state's elections,

25   designed to address.

1              Is that responsive to Your Honor?

2              THE COURT:  It is.

3              And to go on a bit further, I see ballot harvesting

4    as a political evil whereby one person or more who is committed

5    to that particular practice collects ballots from persons who

6    are of the wrong opinion, that the harvester is going to

7    faithfully deliver those ballots to the appropriate voting

8    precincts, untouched, unchanged, to reflect what the original

9    person, voter, has chosen.  But nevertheless, that choice is

10   changed by the harvester, and thus skews the intent of the

11   person who is the voter as well as provides an improper vote as

12   a result therefrom.

13             So I went back through the papers and I was looking

14   to see if anywhere in the papers this particular circumstance

15   has been a circumstance married to Mississippi in any sort of

16   way.  And unless I missed it, I didn't see where there was

17   discussion on that.

18             MR. MIRACLE:  Your Honor is correct as to the latter

19   point, that there was no particular discussion.  I think one of

20   the issues that's always problematic with respect to voter

21   fraud or voter integrity or the issues that Your Honor is

22   addressing is identification of when those issues arise.  And

23   certainly when particular instances of voter fraud, whatever

24   they may be, whether it's ballot harvesting or any type of

25   voter integrity issues that would impact the types of things

1    Your Honor is discussing about undermining the integrity of

2    that vote.

3            But I would say, Your Honor, that they are -- that

4    can be challenging to identify unless there are particular

5    instances.  But I don't think that proves -- the negative

6    doesn't prove that it's not a real risk, that it's not an

7    emerging risk.  And it's not something that under the state's

8    broad authority to protect the integrity of its elections that

9    the legislature is powerless in this arena to ensure that

10   individuals who cast their vote, that it is in fact delivered

11   and it is in fact transmitted to the place where it was

12   supposed to go.

13           So I think this encompasses -- I mean the legislature

14   would not be doing its job if it were not always looking for

15   particular areas that are emerging that become problematic,

16   whether it's in other jurisdictions.  But this is a, this is a

17   policymaking decision that the legislature has made and the

18   governor has signed for the very reason that Your Honor has

19   pointed to.  So once that -- and it's targeted to those two

20   particular issues of collection and transmission.  That point

21   at which the voter thinks that they have actually, you know,

22   finished their, their vote, but once it's transmitted to

23   somebody else, they, they don't, they don't know where, where

24   it reaches its final destination or not.

25           So the absence of any of those instances that Your

1    Honor's asking about certainly I do not think causes any

2    concern from a legislative and policy standpoint in addressing

3    what is a known evil, as Your Honor -- to use Your Honor's

4    term, when a vote can be undermined in the final stage of the

5    process by collecting it and transmitting it, and maybe it

6    never reaches its destination.  And how does the voter ever

7    know?  How does the voter know, and how does the state, the

8    state election machinery ever know?  And that may make what

9    this particular issue is so nefarious from that standpoint of

10   detection.

11          So this is a policy and a legislative policy decision

12   that the legislature has, has adopted to further try to ensure

13   the election integrity process with exceptions that are clearly

14   sufficient and clearly for the individuals that are named here

15   before this court to, to be satisfied that they can rely on and

16   use the people that they're using.  Because I guess at the

17   appropriate time we can discuss the exemptions, but on the one

18   hand they want to define caregiver so narrowly that it excludes

19   virtually anybody -- you know, particularly their plaintiffs

20   where the plaintiffs are assisters, they're trying to create

21   this very, very narrow, well, we don't know if that person

22   fits, or we don't know.

23          I think it is not a defined term.  That is certainly

24   the case.  But the court knows how to, in instances where terms

25   are not defined, the court can handle that.  The court can --

1    there are rules for that.  There is one identified definition

2    in our papers.  That is one.  There are others.  But what I

3    would say to that, Your Honor, is with respect to the

4    individual plaintiffs before that court, whether you use the

5    exemption or the definition that is in our papers or whether

6    the court looks at other generally accepted definitions of

7    caregivers in our society, I think the claims of the plaintiffs

8    fall by the wayside, and I think they comfortably meet that

9    definition.

10          And we'll talk about the organizational and

11   associational standing and how that relates, but I want to make

12   that point clear, is that whether -- whether the court looks to

13   the definition that we have proffered in our papers or other

14   definitions, I think -- I think that satisfies the inquiry

15   here.

16          And what I would say with respect to people that are

17   in long-term care facilities or other facilities, I don't think

18   it's a genuine argument to say we're not sure whether people

19   that work in those facilities are caregivers.

20          Now if I misunderstood the argument, I apologize.

21   But to say that we don't know people who are taking care of

22   people in institutional settings, whether it's a hospital, a

23   long-term care facility or whatever the palliative care

24   facility may be, I think it strains the argument to say we

25   don't know whether "caregiver" would be encompassed.

1        So with respect to the definitional exemptions in

2   2358, I think they certainly satisfy Section 208's mandate.

3        And what I would also say, Your Honor, is with

4   respect to that, to the extent we're arguing or we're

5   dissecting definition, I think that proves the point that we

6   make in our papers, that Section 208 does not have the

7   categorical effect that the plaintiffs have proffered.  They

8   have said that you can choose anybody, full stop, with the

9   exception of the employer or the union representative

10  exemption.  But to the extent we're talking about definitions,

11  and we don't know if we can meet those definitions, that's a

12  whole nother, that's a whole nother question.

13       Their claim is, under Section 208, it is unfettered,

14  but for the way they read 208.  But other than that, their

15  claim is it is unfettered, we can select anybody.

16       And I think the fact that we're discussing how these

17  exemptions apply shows that the states have some latitude here

18  in crafting these, these exemptions to meet the purposes of

19  Section 208, to make sure that every voter that should have --

20  every voter's vote is not only marked but cast as it should be

21  as it was intended.

22       And what I would say, Your Honor, with respect to the

23  scope of 208, the legislative history, and Your Honor's

24  correct, it does not speak specifically to preemption.  But

25  with respect to this unfettered view of 208 that the plaintiffs

1    have, the legislative history actually supports the state's

2    view on this, as 208 not being unfettered in the manner in

3    which the plaintiffs read it.

4          And I would just quote, and this is in our papers,

5    but I would quote that the committee intends the voter

6    assistance procedures -- I'm sorry.  State provisions would be

7    preempted only to the extent that they unduly burden the right

8    recognized in this section.

9          Now, I read that as that means the state has

10   latitude.  That means the unfettered categorical position of

11   the plaintiffs about what 208 means, I think we have to take

12   208 at its face value.  But the fact that the committee, the

13   Senate Judiciary Committee, said provisions would only be

14   exempted to the extent that.  That, by my reading, means not

15   everything is preempted.  And the view here is anything the

16   state does that is not the way they read 208 is preempted.

17         So I don't think the legislative history supports the

18   argument for the reading that they're providing, Section 208.

19         THE COURT:  Yes, you're correct.  You did make that

20   argument, you know, at more than one place in your brief, that

21   by that language this court should understand that there is not

22   wide preemption even as we use the term, but that the states

23   still have some authority and the states still have some right

24   to control this election so long as it's not in conflict with

25   the national law on the point.

1          But let me return to another point, and that is this

2     one.  This is in essence a criminal statute, would you agree

3     with me?

4          MR. MIRACLE:  It is a misdemeanor, and it's actually

5     contained in the election code, so it's not a separate -- but I

6     agree with you, it is.

7          THE COURT:  Yes, it's not --

8          MR. MIRACLE:  It has criminal penalties.  It's part

9     of the voter intimidation statute in the election code.  So it

10    is married to any act under the election code that would be

11    encompassed within voter intimidation.

12         But to your question, I agree with you, there are

13    misdemeanor penalties attached to this.

14         THE COURT:  And a misdemeanor is a criminal matter.

15         MR. MIRACLE:  Yes, Your Honor.

16         THE COURT:  So then it then would have a criminal

17    penalty attached to a violation here.  And while the

18    misdemeanor is not a felony, nevertheless, it is a misdemeanor.

19    And of course a misdemeanor on one's record can have dire

20    consequences even though just a misdemeanor.

21         But this state statute would provide for conviction

22    of a misdemeanor.  And when a statute provides for some

23    criminal outcome, the courts are required to take a harder look

24    at that particular matter to determine whether the contents of

25    the statute unnecessarily chills the enthusiasm of those

1   affected.  So inasmuch as this statute provides for a

2   misdemeanor, then we would assume that persons who wish to

3   exercise rights or activities that might be deemed to be in

4   conflict with a state statute would have to be cautious as to

5   whether they fit the definitions of those who can act in

6   accordance with the statute.  Would you agree with me on that?

7          MR. MIRACLE:  I would agree with you on that, Your

8   Honor.  As I would also say within the election code as to any

9   manner of ballot tampering or any other activity that could fit

10  within that statute, so I would say it's not only just this

11  particular activity but within the existing framework of the

12  Mississippi code, there are certainly activities which would

13  violate and constitute a misdemeanor.  So --

14         THE COURT:  Well, I --

15         MR. MIRACLE:  I agree with the point Your Honor is

16  making, though, certainly.

17         THE COURT:  And I'm going further, because on this

18  particular matter one who wants to be of assistance to others

19  would have to read this statute carefully to determine what the

20  definition of caregiver would be, and also to try to look at

21  what exceptions are allowed for that person to act.

22         Would you say that that might have some chilling

23  effect upon those who wish to assist, unless they know for a

24  fact that they would not be prosecuted?

25         MR. MIRACLE:  My answer would be that with respect to

1   the relationship here, and I think this is important, that if a

2   person has been providing this type of assistance to the

3   examples that were cited by counsel opposite, for the assister

4   and the plaintiff, I think it's reasonable to believe that the

5   people that are providing that type of assistance, I mean, and

6   I think that's where trying to define "caregiver" too narrowly,

7   I mean it can't be unfettered either, but defining it too

8   narrowly.  But I think that the relationship between the

9   parties should be a guidepost there in aiding a person to say,

10  I regularly assist this person, you know.  So for the

11  plaintiffs that are before the court that have submitted

12  declarations, you know, the court has something it can look at

13  and say, you know, is it reasonable to assume that those people

14  who have been providing this service for these particular

15  people who cannot -- or who need assistance because of their

16  physical condition, there's a relationship there that -- that I

17  think would be a guidepost to give aid to the person to say, I

18  regularly do this or I have a relationship with this person.

19        And I think, you know, that's what underpins

20  Section 208.  And I thought it was interesting when counsel

21  opposite said, you know, random person is okay, for example.

22        Well, you know, if you go back to the legislative

23  history, one of the legislative histories, you know, talks

24  about having this trusted relationship so that there is not a

25  possibility that the person requesting assistance is going to

1   be taken advantage of.

2          And so here again this notion of any random person,

3   you know, that in and of itself, when counsel opposite talks

4   about the text and the case law and the purpose, well, that,

5   that's inconsistent with the purpose to say I can have any

6   random person who I have no relationship with or no trust, I

7   mean that goes against what Section 208 certainly was trying to

8   achieve.

9          THE COURT:  Now --

10          MR. MIRACLE:  To answer the court's question, I think

11   that relation --

12          THE COURT:  Mr. Miracle.  I agree with your saying

13   that this is another way of looking at it, but what about the

14   person who has been in this position for quite a while as one

15   of the persons mentioned by Mr. Miracle has been, and that

16   person has a question whether she is targeted for prosecution,

17   or would be.  How does she get to answer to that if she can't

18   look at the statute and make that determination right off at

19   first blush, to see the definitions as to whether she fits

20   within those definitions?

21          MR. MIRACLE:  Well, I think that's always an issue

22   with every law that is passed where somebody has to look at it

23   and determine whether or not they fall within it.

24          Certainly we're here before the court today with this

25   particular issue that's now been raised, this law has not gone

1  into effect yet, and this court may have the opportunity to, to

2  shed light on based on statutory construction, you know, what

3  the parameters of "caregiver" may be, so we are, we are in a

4  posture currently with the plaintiffs bringing this to the

5  court as it has that the court I think, based on the way the

6  parties have framed the issue, the court has an opportunity to,

7  to apply statutory interpretation and statutory construction

8  when undefined terms are present, to provide some of that, that

9  guidance, because we're now here in the form of a lawsuit

10 before this goes into effect on July 1.

11      So I think this makes it specific as to how somebody

12 may know as to how the court views how it applies what that

13 definition means within the context of 2358.  And then I think

14 like other laws you certainly have to use your judgment as to

15 whether or not you fall within those.

16      Again, I think -- I think if you're a -- if you're

17 a -- if you're the, quote, random person who shows up and, you

18 know, maybe that's a little bit different story, and I think

19 we'll get to some of the standing issues on this, Your Honor,

20 because I mean that's one of the problems here.  This is a very

21 individualized inquiry.

22      And so you're being asked via organizational or

23 associational standing to, to measure how this would be applied

24 to all these different individuals.  As you can see from the

25 declarations that were submitted by the individuals that are

1    here before the court, they have individual circumstances, and

2    of course the plaintiffs wanted to make the court aware of what

3    those circumstances were, but just as their circumstances may

4    be different, that's what -- that's why this, this -- you know,

5    the court is familiar with the phrase standing is not dispensed

6    in gross from the Daimler Chrysler and long line of Article III

7    standing cases, certainly that's one of the particularized

8    issues where Your Honor is asking about how is somebody going

9    to know?  You know, if they are a random stranger and they

10   knock on someone's door and say, Do you need assistance with

11   your, with your ballot?  You know, I would say there is a

12   continuum there of that person.  But if you have a

13   relationship, an ongoing relationship with somebody and you

14   have been providing that, that assistance, then I think that's

15   a different question as well.  I think that changes the court's

16   inquiry about the -- how is the person supposed to know?

17            THE COURT:  So then are you saying, Mr. Miracle, that

18   if this court chooses to uphold the statute, the court should

19   write a detailed opinion to explain to the public who's

20   included and not included?

21            MR. MIRACLE:  No, Your Honor, I don't mean to suggest

22   that.  But I think given the fact that the issue has been

23   raised to the court by the plaintiff that this is an undefined

24   term and the law provides a framework in how, how terms can be

25   construed.  I certainly think that the definition that has been

1    included in the state's paper is one view.  There are other --

2    there are other views out there.  That was the American Medical

3    Association's view of caregiver.  So, no, we're not asking this

4    court to write the statute or rewrite the legislation but to

5    apply the term "caregiver" in its ordinary meaning, which is

6    what the law requires in an undefined term.

7          THE COURT:  Are there other terms within the body of

8    this law that need to be clarified?

9          MR. MIRACLE:  I would say "caregiver" has certainly

10   drawn the most.  I did hear reference to a distant family

11   member.  I think that strains the interpretation.  If you're

12   saying I'm second or third, you know, family member removed, I

13   mean "family member" I think is a reasonably well known term,

14   and so the extent to which you may be related I don't think is

15   certainly problematic.

16         And then I would say with respect to "household

17   member," I think that is using ordinary, common principles of

18   what a household member, that -- you know, that doesn't have to

19   be a relative, so that phrase in and of itself has quite a

20   broad meaning.  We haven't discussed it much.  "Caregiver" has

21   gotten most of the attention.  But a family member is a fairly

22   particular, I think we can all agree, how you would look at

23   that and how you would determine that.  But you could be a

24   household member who's under the roof of that household who may

25   not be a family member before you even get to caregiver.

1          THE COURT:  Well, let's talk about family member for

2     a moment.

3          MR. MIRACLE:  Sure.

4          THE COURT:  How many persons would be under that

5     umbrella, first cousin?  Second cousin?  Third cousin?  How far

6     down do we go for a family member?

7          MR. MIRACLE:  Using an ordinary definition of family

8     member, I don't know that there is a limitation.  I don't know

9     that there is a cutoff that I could supply to the court.  I

10    think if you can determine that you are a family member related

11    in the manner in which the court is suggesting, I certainly

12    think you would fall into the family member category.  I don't

13    know -- the legislature certainly didn't include it.  In

14    including "but limited to," they did not seek to limit in that

15    definition how far down the family tree one should go to

16    determine that.

17         So I would suggest that a family member should be

18    taken at face value in terms of whatever that family

19    relationship may be.

20         THE COURT:  So then you would expect if the court

21    were to uphold this law, that the court would speak to these

22    matters and provide some sort of interpretations and some sort

23    of definitions to guide the public?

24         MR. MIRACLE:  Beyond, Your Honor, with respect to say

25    family member, I think other than the court were to -- which we

1    certainly respectfully ask this court to do, uphold this

2    statute, I don't know that the court has to undertake a

3    detailed definition of "family member" or "household member."

4    Again, "caregiver," we've talked about "caregiver," but I would

5    suggest to the court that a term like "family member," unless

6    the legislature has said this includes, you know, and

7    identifies the particular family member, and it has an

8    exhaustive list of what constitutes a family member, I think

9    "family member" has to be read in a broader -- in a broad sense

10   of how that term is generally accepted.

11          So I don't think the court has to undertake its own

12   independent research about genealogical, you know, connections,

13   but "family member," as that term is commonly understood

14   through available sources as our case law teaches us about how,

15   how courts view undefined terms, I don't think "family member"

16   and I don't think "household member" would require the court to

17   do that.  I think the court has latitude to look at "caregiver"

18   and how that phrase is used in settings to determine

19   particularly with respect to these plaintiffs before this

20   court, the individual plaintiffs, how that, how that

21   interact -- how their cases interact with Section 208 and S.B.

22   2358, and I think they comfortably fall within those

23   categories.

24          THE COURT:  When I went on the bench eons ago, I

25   found I had a whole lot more cousins than I knew.  So they were

1    addressing me as "cuz."

2              MR. MIRACLE:  Understood.

3              THE COURT:  And I was trying to look them up.

4              MR. MIRACLE:  Understood.

5              THE COURT:  And if I had listened to them, that tree

6    was huge, especially around Christmas.

7              MR. MIRACLE:  Understood, Your Honor.

8              I think going back to the, to the reason for 208 and

9    this notion of a true person sort of underpinning this, I can't

10   speak and I would not be truthful to the court if I said I

11   could, you know, if somebody said I'm your third or fourth

12   cousin and you're a total stranger, we never crossed paths and

13   somebody's representing to the voter that they're my third --

14   they're the third cousin, then, you know, I don't think we can

15   speak to that.

16             What I would say, though, is that Section 1 of 2358

17   talks about a person knowingly doing this.  So if somebody is

18   coming to the voter and misrepresenting who they are, let's

19   just use "family member" as an example, then I don't think they

20   should have any expectation of whatever may come of them with

21   respect to potential penalties under the statute if they're

22   making a misrepresentation to the voter about who they are for

23   purposes of transmitting or collecting that ballot.

24             THE COURT:  Two other matters occur to me on this

25   same topic.

1          First of all, you are saying that -- or if you are --

2    that you are trusting that two other defendants who represent

3    the judiciary here in this lawsuit would have to be trusted to

4    do the, quote/unquote, right thing?  Because if one of the

5    county attorneys were to charge an individual with ballot

6    harvesting and that county attorney takes the position that

7    that individual is not a family member or is not one of these

8    other persons who fit within the statute, then the charged

9    person would have to contest the charges if that individual has

10   not to that point intimidated and chose not to indulge in the

11   ballot assist.  But if the person decides to go forward with

12   assisting, then if the person is charged is not a mere fact of

13   looking up the genealogical chart, as you mentioned, but

14   instead that person could stand before the altar of criminal

15   justice and risk being convicted of a misdemeanor after a jury

16   trial, if this matter is then pushed to a jury trial, because

17   there is no understanding as to what the definition would be to

18   exempt that individual that is listed in the statute, if that's

19   the case.

20         So why wouldn't that chill persons who would want to

21   exercise this right to assist into not assisting?  Because the

22   option might be that the individual could be charged and then

23   face the prospect of a conviction after a jury trial.  So why

24   wouldn't that all add up to a chilling effect provided by the

25   lack of specific definitions in the statute?

1          MR. MIRACLE:  One, the one response I would have is

2     if we're using "chilling" in the context of a legal claim and

3     if the court means something differently, then I certainly

4     apologize for what I'm about to say, but the answer I would

5     give is if we're talking about chilling in the First Amendment

6     context with respect to the voter assistance, we don't have a

7     First Amendment claim here before you.

8          The assister plaintiffs are not making a First

9     Amendment claim that this statute is vague, applying the

10    principles of vagueness under the First Amendment.  So they're

11    bringing a completely, you know, statutory Section 208 claim.

12         So that would be -- my legal response to that would

13    be if we're talking about chilling in the First Amendment

14    context, we don't have a First Amendment claim here before the

15    court.

16         But I appreciate Your Honor's question about the

17    natural outcome of somebody who may be subject to the penalties

18    under the, under the penalty section of this statute.

19         I presume the reason that the plaintiffs brought suit

20    and named two county prosecutors was for that purpose.  They

21    certainly have prosecutorial discretion.  That is, certainly I

22    would not speak on behalf of either of the two county

23    prosecutors that are named in this case and how they would view

24    that in a particularized case.  And I do think that also

25    factors into what the particularized facts are, so I think it

1    makes it challenging from a, from a hypothetical standpoint to

2    say how that would get resolved.

3          But, again, if you're a, if you're a person who has

4    not been sought out and you're going to the voter, I think you

5    have to -- if you are aware of the penalties, I think you have

6    to -- or you have to -- you have knowledge or you have, you

7    know, constructive knowledge that there are penalties for voter

8    fraud and things of that nature, and you're a stranger to the

9    transaction, I think that that's one equation.

10          I think what the -- what I sense the court is driving

11    at is a continuum of facts where it may be easier to assess

12    somebody's relationship if it's continuing and ongoing versus

13    maybe there is a continuum of whether that relationship is not

14    as well established.  And I would simply say that's an

15    assessment that, from the criminal standpoint, a county

16    prosecutor with the facts of the case, like he or she would any

17    other case, have to assess whether or not there's been a

18    violation of the statute.

19          THE COURT:  So then we'll back up to the lick-log of

20    what exactly does the statute provide as to whether the statute

21    itself is clear enough that one who wishes to assist can depend

22    on the language of the statute to show that he or she has not

23    violated, as opposed to a statute which has a broad description

24    which might have some vagueness as to whether there has been a

25    violation.

1            I asked earlier that if I were to uphold the statute,

2   would you be asking the court to do a detailed opinion that

3   would set out the court's reasoning with regard to the

4   integrity of the statute itself but also as to how it should be

5   interpreted?

6            But then I thought about this term "judicial

7   activism," which is a term which describes where a judge goes

8   beyond a statute, beyond the legislative history of the statute

9   and thus rewrites the statute, which is in so many, many

10  circles frowned upon as invading the arena of the legislature

11  and that the court shouldn't go that far but only deal with the

12  statute as written and interpret it as written.

13           So then if that be the case and if the court were to

14  be festive about any particular criticism under judicial

15  activism, then the court would have to be bound by just the

16  wording of the statute, and maybe in some instances say that

17  this word should be taken in its common sense and everyday

18  usage but other words might not get the same enjoyment.

19           Thus are you saying that the court should supply a

20  definition so that the public would have some idea of who is

21  included and who is excluded?

22           MR. MIRACLE:  The way the issues are framed in this

23  lawsuit, the plaintiffs have challenged 2358.  We have

24  responded that the statute provides exemptions.  They have

25  responded in kind and said those, those exemptions are not

1    defined.

2        We have proved what are ordinary interpretive tools

3    for the court to apply that to the extent they're undefined,

4    then the court can use interpretive tools, as the case law

5    says, given its ordinary meaning.  I don't think that requires

6    the court, and I agree with what the court just said about

7    rewriting the statute, and that's certainly not what I am

8    suggesting, or if I have said anything to suggest that, I

9    certainly will say categorically we're not asking the court to

10   rewrite the statute.

11       I think the legislature chose the terms it chose.  We

12   think they're easily susceptible to interpretation.  The

13   plaintiffs have said they're not defined and the law provides

14   the court with a mechanism to apply ordinary meaning to those

15   terms to determine whether or not they satisfy, otherwise

16   satisfy the requirements that the court is being asked to

17   address.

18       So I think it's a much more narrow inquiry than this

19   broad undertaking that the court would have to do this.  I

20   think just like any other case where the court is presented

21   with a term that does not have its own legislative definition,

22   the court has tools at its disposal to say "the ordinary

23   meaning of caregiver or the ordinary meaning of family member

24   is this, therefore under the defendant's view of this case I

25   find..."  That's what I am suggesting would be the proper, from

1  the state defendants' point of view, way to view the

2  interpretive canon, the interpretive analysis of this.

3          But it's in the confines of the plaintiffs have said

4  these aren't defined, we don't know whether they apply to us or

5  not.  And we have offered a definition that's available.  But

6  the case law supplies how a court addresses undefined terms.

7  And so that's where I would leave that, but not suggesting that

8  the court could rewrite the statute in its own, in its own

9  accord.  I'm not suggesting that.

10         THE COURT:  The plaintiffs have submitted three major

11 examples of where there could be an impact upon one who wishes

12 to assist.  Those three examples, are they covered under the

13 statute?

14         MR. MIRACLE:  I think a fair reading of the statute

15 is they are covered.

16         THE COURT:  All right.  Would you describe each one

17 and why neither one of those persons should fear prosecution

18 under the statute?

19         MR. MIRACLE:  And with respect to the -- we're

20 speaking of the assisters that are providing, currently

21 providing assistance to the voters.  Is that --

22         THE COURT:  That's correct.  The --

23         MR. MIRACLE:  I'm sorry.

24         THE COURT:  Go ahead.

25         MR. MIRACLE:  Any response would largely be that

1    those details, the relationship that exists with respect to

2    those individuals, they have given the court particularized

3    situations where they have been providing that assistance.

4    They're -- to my understanding, they would continue to provide

5    that assistance.  There is a known relationship between these

6    parties.  So I think for those reasons alone, I think they,

7    they would, under a fair reading of the statute, be covered.

8         THE COURT:  Then if a prosecuting attorney, not as

9    reasonable as the two who are being sued here, had charged a

10   person fitting that same category, are you telling me then once

11   charged that a defendant could file a motion to dismiss, which

12   on his filing to be granted under the statute as clear point of

13   law that the prosecution is unwarranted?

14        MR. MIRACLE:  As much as I'd love to give the court a

15   categorical answer to that, I think the hypothetical is such

16   that I simply could not, given whatever the facts of those

17   cases would be, and the discretion of the prosecutor, I mean

18   I -- that's just, that's just -- if I said anything else, I

19   don't think I would be giving the court a fair answer.

20        So I --

21        THE COURT:  What about the lady who was assisting the

22   amputee?  What about her, if she was charged?

23        MR. MIRACLE:  Based on the facts that are before the

24   court, I think she likely falls within the term caregiver.

25        Now I am not -- I am not the prosecuting attorney

1  vested with this, with this charge, but based on the

2  information that's been provided to this court and based upon a

3  fair reading of what the term caregiver would be, and I don't

4  think it's a fair characterization to define caregiver as

5  narrowly as counsel opposite would have the court want to view

6  to try to categorically exclude the assister for the individual

7  plaintiffs before this court.

8          So I think, I think a fair reading, though, would

9  encompass, in my reading -- now, I am not the prosecuting

10  authority, so I have that limitation.  And I think it's only

11  fair to make that representation to the court.  But I think

12  it's a fair characterization of the terminology and the facts

13  that the court has presented to it, that they would, they would

14  fit that definition.

15          THE COURT:  Would you see that as a question of law

16  and a question of fact?

17          MR. MIRACLE:  If the person were charged and came

18  forward and said I'm a caregiver within the meaning of this

19  statute, then that would be a question, that would be a

20  question of law, I think.

21          THE COURT:  Not a question of fact, in addition?

22          MR. MIRACLE:  It may be a question of fact.

23          THE COURT:  And then if it is a question of fact, who

24  would submit the fact on behalf of the charged individual?

25  That person would, apparently.  And therefore the prosecutor

1     could, on the other hand, submit facts favorable to the

2     prosecution.  And if it is a question of law, but a question

3     nevertheless, that means that the court has to make a

4     determination on the legal end.  But if the court did not make

5     that determination, then on the factual part of the prosecution

6     the defendant and the prosecutor would have to submit that

7     matter to a jury.  And that means that someone who is charged

8     with being a, quote/unquote, caregiver might have to go to

9     trial on that particular matter.

10            And if that's the case, and anybody else heard about

11    it, it would seem to me that might be a chilling effect on

12    somebody else who want to serve as a caregiver who can point to

13    anything specifically in that statute that says that they are

14    exempt, other than a term that might be construed as broad or

15    vague.

16            What's your response to that?

17            MR. MIRACLE:  Again, Your Honor, I don't think

18    that -- I mean any law that has a criminal element to it has

19    some level of definition to it.  So I don't think that the fact

20    that this particular law has definitions in it that have

21    misdemeanor penalties attached to it makes it any different

22    than any other penalties.

23            And, again, I reference this particular provision of

24    the code is found within the election codes.  So it is

25    particular to election type activities.

1            But there is no way in any definition or in any, any

2    sense that I can stand here before the court and anticipate

3    every factual situation that may arise other than, again, the

4    people that are before this court with particularized facts

5    that say I've been doing this, I have this relationship.

6            If they want to say I'm not a caregiver, then that

7    may be a choice they make for whatever reason, but I certainly

8    think if somebody has been historically providing a service to

9    somebody who otherwise is doing it out of the goodness of their

10   heart and trying to make sure that everyone's voting, you know,

11   I certainly think the facts do matter.

12           Let me, let me clarify, if I said, you know, this was

13   an issue of law only, but, you know, with the plaintiffs before

14   this court, I think they have demonstrated that they have been

15   doing this, they have been assisting voters, and therefore that

16   certainly should inform whether it's this law or any other law

17   that we as citizens are subject to, have to -- have to assess

18   whether or not we may be encompassed within that.

19           But I certainly can't speak to every hypothetical

20   that may come along, and every individual who may not be in

21   exactly the same situation that these plaintiffs are, that -- I

22   simply couldn't make that representation to the court about how

23   that would play out 100 percent of the time.

24           THE COURT:  And I want to be sure I understand how

25   far you're going on this point.

1          Are you saying that the individual plaintiffs here

2    would not be subject to the penalties provided by this law?

3          MR. MIRACLE:  Well, Your Honor, because that -- that

4    goes beyond -- that is up to people who have their own

5    independent jurisdiction.  And again I'm assuming that's why

6    the two county prosecutors were named here today, speak to

7    that.  But if the court's question is could I categorically say

8    somebody would never do something, I simply couldn't make that

9    representation honestly to the court.

10         THE COURT:  No.  I'm just asking with regard to those

11   persons who are named herein as plaintiffs, where their

12   activities have been described, if those activities are the

13   ones brought to the attention of the other defendants in this

14   case, the two defendants here who are county attorneys, are you

15   saying categorically they should not be charged?

16         MR. MIRACLE:  My position is that based on the

17   evidence that they've submitted, I think they would meet the

18   definition of caregiver as that term is properly defined.

19         THE COURT:  Okay.  So then you would have no sway, no

20   persuasion power, with regard to those two county officials?

21         MR. MIRACLE:  No, Your Honor.

22         THE COURT:  And they would still be able to exercise

23   their own discretion?

24         MR. MIRACLE:  I would think so, Your Honor.

25         THE COURT:  Now then, you mentioned exemptions.

1   Twice you were ready to go into exemptions and twice I stopped

2   you.

3          MR. MIRACLE:  Well, I think we have actually, through

4   that discussion, I think we have largely addressed the

5   exemptions, and they are, in the state's view, state

6   defendants' view, they are broad and they do encompass --

7   balanced with, but this is where it gets with the -- with our

8   primary difference of the legal issue here before the court

9   whether Section 208 is unfettered or whether Section 208 allows

10  states some latitude to protect the integrity of its election

11  process.

12          And, you know, we have several district court -- at

13  least two district court cases that have so held and are in our

14  papers, and so I know the court is aware of them.  The Nessel

15  decision from 2022, that actually started in 2020.  It went to

16  the Sixth Circuit on another issue, came back down and another

17  district judge then picked up the case and addressed twice --

18  the issue of Section 208 and voter assistance was actually

19  addressed twice by the district court in Nessel, once in 2020

20  and again in -- and as Your Honor is aware, there the court

21  said that states do have some latitude and that a reading of

22  the definite article/indefinite article analysis that the court

23  went through, and the legislative history evidences that there

24  is latitude for the states and they're not confined to the

25  interpretation that is being proffered by the plaintiffs that

1   states cannot -- you know, because really, under the state --

2   under the plaintiffs' view, these exemptions are of no

3   consequence.

4       Now, they would say there are no exemptions beyond

5   what Section 208 says.  I mean that -- we have a vast

6   difference of opinion about what Section 208 means.  So we have

7   the Nessel decision, which is clearly in accord with our

8   position that the states have that latitude, and then the Ray

9   decision was a district court case from Texas, 12 years before

10  Nessel, and it reached the same conclusion that states do have

11  this latitude and that a voter does -- voter assistance does

12  not mean anybody.  I mean that's what the district court said

13  and the court there also relied upon the legislative history to

14  say states have latitude in this arena.

15      There are two state court cases which we cite in our

16  papers which were cited by the district court in Ray, which

17  both came to the same conclusion.  So this is, this is not a

18  novel argument.  This is not a novel idea that Section 208

19  has -- affords states some latitude and that the conflict

20  preemption is not absolute if a state tries to exercise some,

21  some discretion in this arena.

22      We obviously both address OCA Houston in our papers,

23  and that was addressed by counsel with respect to the

24  exemptions.  I think we have a little bit of a different

25  interpretation of what OCA actually held.  You know, while

1    counsel opposite said had the Congress wanted Section 208 to

2    say something in particular, they could have done so, well,

3    just so too could the Fifth Circuit have said that states are

4    not allowed to operate in this arena.  That states -- what they

5    did say was Texas's statute impermissibly narrowed Section 208.

6          But I think it's interesting to note that the court

7    used the term "impermissible" in its opinion.

8          And to me impermissible denotes the fact that there

9    would be a permissible set of exemptions.

10          So this notion that OCA gives no breathing room

11   whatsoever and it has categorically closed the door on this 208

12   argument, that is obviously a position we do not agree with.

13          Counsel mentioned that it's a binding precedent.  I

14   in no intention -- I'm not suggesting that OCA is not binding

15   precedent.  It's binding for its purposes.  But I don't believe

16   a fair reading of OCA -- the court did not say that a state is

17   categorically prohibited from exercising exemption.  It just

18   didn't say that.

19          So I think -- I think that's what OCA stands for, and

20   obviously we have a difference of opinion about, about its

21   application here, but I categorically dispute that it

22   forecloses the argument we're making and the argument that has

23   been made by other district courts.  At no time in the OCA

24   opinion did they, did they disavow the court's holding in Ray.

25          The response to that was, well, it's been overruled

1    by implication.

2             I think that's an argument that gets made when a

3    decision is still out there, that, you know, a later opinion

4    may touch on, but nowhere in OCA Houston did the court say, We

5    overturned the Ray decision.  And Ray clearly stands for the

6    proposition that we're offering to the court today, that the

7    states, and particularly the State of Mississippi, have

8    latitude in this arena.

9             And again I think that supports the motion and

10   rejects and counsels against the argument being made that

11   Section 208 is unfettered the way the plaintiffs are reading

12   it.

13             THE COURT:  I saw in the papers --

14             MR. MIRACLE:  Yes, sir, Your Honor.

15             THE COURT:  I saw in the papers --

16             MR. MIRACLE:  Yes, sir.

17             THE COURT:  -- that the number of absentee ballots in

18   Mississippi might approach the number of a hundred thousand.

19             Did you see that?

20             MR. MIRACLE:  Yes, sir.  In the papers, yes.

21             THE COURT:  Okay.  It was in the papers that are

22   before the court.

23             Do you agree with that figure?

24             MR. MIRACLE:  If you would indulge me for one moment,

25   Your Honor.

1          THE COURT:  Okay.

2       (Conferring discussion.)

3          MR. MIRACLE:  Thank you, Your Honor.

4          THE COURT:  All right.

5          MR. MIRACLE:  So that number is, is approximately

6   correct; however, the vast majority of those absentee ballots

7   are in person and a much smaller percentage are mail-in.

8          THE COURT:  So that brought up my next question of I

9   didn't see what percentage was attributed to assisted voting.

10         Do you have such a number?

11         MR. MIRACLE:  No, Your Honor, we wouldn't have that

12  number.

13         THE COURT:  Okay.  Now then, I want you to look your

14  notes over because I know I interrupted you several times, and

15  I want to take a 15-, 20-minute recess, y'all let me know

16  you're ready to go back.  Look your notes over and see if there

17  is something else that you want to submit to me that I stopped

18  you from doing by asking my questions.

19         MR. MIRACLE:  And there would just be, I think, one

20  point I want to touch on standing, and those are a couple of

21  points that were raised by counsel opposite, and I think I'll

22  look at my notes, but I know I did want to address standing.

23         THE COURT:  All right.  Look at your notes.

24         And then, in addition, during this same recess

25  plaintiff can look over plaintiffs' notes and be ready to

1    submit any argument in rebuttal.

2           So I will be in recess.  Let's just make it

3    20 minutes so you have ample enough time to take care of your

4    personal needs and also to look your notes over.

5           So make it 20 minutes, all right?

6           MR. MIRACLE:  Thank you, Your Honor.

7           THE CLERK:  All rise.

8       (Recess.)

9           THE CLERK:  All rise.

10          THE COURT:  Mr. Miracle.

11          MR. MIRACLE:  Yes, Your Honor.

12          THE COURT:  Do you have some other points you wanted

13   to raise?

14          MR. MIRACLE:  Briefly.

15          THE COURT:  Go right ahead.

16          MR. MIRACLE:  Thank you, Your Honor.

17          I want to touch on the standing, although this is in

18   our papers, it's really in response to counsel opposite's

19   argument.

20          Under the view espoused with respect to Disability

21   Rights, under the theory they espouse, Disability Rights would

22   have standing in every single case involving an election

23   challenge, and I simply -- you know, the court is well aware of

24   Article III jurisprudence, and I think they still have to

25   demonstrate Article III standing for organizational standing

1    and for their associational standing.

2          You know, the problem with that is, is the court, as

3    we discussed today, that's a very individualized assessment of

4    these particular plaintiffs.  So on the organizational

5    standing, again we've addressed this, but the diversion of

6    resources is what they cite in their declarations and they try

7    and point out that they are diverting resources from other

8    things.

9          Again, under the controlling law, you know, every

10   time a law is changed, an election law is changed, that does

11   not mean that an organization such as DRMS or the League of

12   Women Voters automatically has standing.  We certainly think

13   that the diversion of resources that have been alleged do not

14   meet the operative standards for organizational standing.

15         And then on the associational front, again, this is

16   a -- this is a particularized type of a case where the -- that

17   the court has heard from declarations for particular plaintiffs

18   that may have situations, but to say, as Disability Rights did

19   in its papers, that Mississippi voters with disabilities will

20   be disenfranchised, that's a conclusory allegation, Your Honor.

21   I don't think that there is supporting evidence for that before

22   this court.

23         So we, we reiterate that we do not believe either

24   Disability Rights or the League of Women Voters who really only

25   said they've had to create some new literature.  That's not the

1    type of diversion of resources that the Fifth Circuit or

2    district courts have applied.  And those cases are in our

3    papers.

4           So with respect to standing, we do not believe the

5    organizational plaintiffs have met their burden for purposes of

6    Article III standing.

7               I wanted to hit very briefly the irreparable harm.

8               THE COURT:  Hold on a second.

9               MR. MIRACLE:  Yes, Your Honor.

10              THE COURT:  You said that if, if every time there is

11   a change in the law where an organization had to change its

12   address or its approach, then there would be no boundaries to

13   the standing and everybody would always have standing.

14          That is an argument you spent some time on in your

15   brief.  And you also addressed some other points of standing,

16   but let me remind you, I have read all of that.

17              MR. MIRACLE:  Yes, sir.

18              THE COURT:  And so I'm familiar with the arguments

19   you've made on those particular points.

20              MR. MIRACLE:  Okay.  Thank you, Your Honor.

21              THE COURT:  And so there was one other thing I was

22   going to mention, but it will come back to me in a minute

23   because I got sidetracked on something else I just thought

24   about.

25              MR. MIRACLE:  Thank you, Your Honor.

1          THE COURT:  All right.

2          MR. MIRACLE:  For completeness of the record, since

3    we're here on a preliminary injunction, I did want to make sure

4    we touched on the all the factors even though they're in our

5    papers.  But I do want to, you know, end where I started, and

6    that's on the interest of the state here in ensuring election

7    integrity.

8          And so with respect to the equitable factors, and as

9    the court is aware, those merge, those last two factors merge

10   when the government is a, is a party.  Clearly the public

11   interest here would be harmed if an injunction issues because

12   this is a ballot integrity measure for all the reasons we've

13   discussed.  It is critical that every voter's ballot is counted

14   and every voter has that ballot transmitted to where it's

15   supposed to go.  And I think, again, with respect to whether or

16   not we can detect fraud, you know, is how is a voter ever

17   supposed to know that their ballot was not transmitted where it

18   was supposed to go?

19         So this is clearly an indisputably strong and

20   important compelling interest on behalf of the State of

21   Mississippi and an injunction preventing it from instituting

22   measures that will continue to further election integrity is

23   clearly against the public interest.

24         So for purposes of our preliminary injunction

25   discussion, I did want to touch on that.

1        And finally, although we strongly urge the court to

2   deny the injunctive relief, I do want -- and again this was in

3   my papers -- I do want to touch on the scope of relief because

4   the requested relief here by the plaintiffs is exceedingly

5   broad.  Not only do they want an injunction against 2354 --

6   2348 [sic], but they also ask that the Attorney General and the

7   Secretary of State be ordered to make certain statements.  That

8   is certainly beyond any, we believe, any proper scope of an

9   injunction.  Even if the court were to issue an injunction as

10  to Section 208 as to particular plaintiffs, certainly some

11  broad statement is -- would be beyond the bounds of Rule 65, we

12  believe, in terms of any appropriate injunctive relief.

13       And then, finally, that goes to the scope of relief.

14  And you've heard a lot today about these particular plaintiffs,

15  and it does appear that particular plaintiffs do matter.  And

16  so the notion that this is sort of akin to a nationwide

17  injunction that gets talked about at the district court level,

18  well, this would be akin to a state-wide injunction where you

19  only have before you a couple of plaintiffs who we've discussed

20  and why we have said we think these particular plaintiffs have

21  met their, met their standing burden, and they would be covered

22  by the statute.  But to issue this broad, sweeping injunction

23  that the plaintiffs have sought here today would certainly

24  be -- would be -- we believe would be inappropriate, and in

25  fact OCA, in the OCA case, the Fifth Circuit actually ended up

1    remanding that case for further proceedings based on the scope

2    of the injunction that was, was issued.

3            And so I would just wind this up by saying, Your

4    Honor, that the state has acted appropriately under

5    Section 208, it has crafted a statute that affords broad

6    exceptions, and we think it certainly meets the statutory

7    requirements of Section 208 for all the reasons we have said.

8    If the court were to entertain any injunctive relief, though,

9    it would have to be very narrowly tailored.  It certainly --

10   the reason this statute was passed was to stop ballot

11   harvesting.  So to the extent that that can only be curtailed,

12   if at all, if the court finds that there is some problem

13   relative to Section 208, it would have to be narrowly crafted

14   to only impact somebody who meets the requirements of

15   Section 208 with a disability or other qualifying event.  But

16   this would have to be a very, very narrowly tailored

17   injunction, if at all.

18           We obviously again categorically reject the notion

19   that they have met their burden for primary injunctive relief.

20           Unless the court has any other questions, I want to

21   thank the court for your questions and indulgence in my

22   argument this morning.

23           Thank you, Your Honor.

24           THE COURT:  All right.  Now, counsel, for two-thirds

25   of his argument, Mr. Miracle had been very court reporter

1   friendly.

2          He had not transgressed as you had earlier when you

3   had got excited and had spat out a volume of words all at -- in

4   one sentence.  And so Mr. Miracle had done great up until we

5   came back.

6          And so when we came back, then, seems like he caught

7   the disease that you have.  And so then he was rushing, and I

8   don't know why he did so because I was not limiting him, just

9   as I didn't limit you, and will not be limiting you either.

10          So I would like that you couch your remarks as he did

11   when he first started.

12          MR. SOUSSI:  Yes, Your Honor.

13          THE COURT:  And consider my court reporter over here.

14          MR. SOUSSI:  Yes, Your Honor.

15          THE COURT:  Who is highly trained and competent at

16   what he does.  And Fred has been with us for many a-years, and

17   so he has been doing a wonderful job because I've had a lot of

18   cases with him over the years, and he has always done really

19   magically when it comes to reproducing his record and getting

20   these matters out to me for further digestion by the various

21   courts and by the public.

22          So would you be so gracious as to think about my

23   buddy Fred down here, you know, because, you know, he came up

24   here from the coast.  I've had a lot cases down in Hattiesburg

25   and the coast, and so that's where he and I have crossed paths.

1    But when I need somebody extra, then I do not hesitate to call

2    on Fred.

3            So here he is.  And I don't want to scare him off,

4    you know, because Fred is a valuable friend and also a

5    consummate professional.  So let's be kind to Fred.

6            MR. SOUSSI:  Yes, Your Honor.

7            THE COURT:  And just slow down.  And I am not

8    limiting you on your time.  So just take your time and go from

9    there.

10           I remember way, way, way back, probably before you

11   were born, when I was in grade school and I spoke rapidly.  I

12   mean rapidly.  And everybody was asking me to slow down.  I

13   did, until I started trying cases as a lawyer, and then there

14   were some court reporters who were -- I think I caught them one

15   afternoon having a meeting, and I think I was the subject of

16   the meeting.  Furthermore, I think that they were trying to

17   determine who was going to do the hit, you know, put a hit out

18   on me.  Because they would ask me after the hearing to describe

19   certain words and to give the definition, be sure they had the

20   right word.  Well, what made it all so difficult was at the

21   time we had a lot of people testifying who came directly out of

22   the hood speaking the highest level of Ebonics, and so

23   sometimes they didn't know the definition of these words; they

24   never heard them before.

25           You know, I remember one lady testifying about how

1    she had gone outside and crunk up the car.  And the court

2    reporter looked over her shoulder at me like, What is crunk?

3    You know, well, I told her just hold on for a moment because

4    you're about to hear something else, because she said the car

5    went about 20, 30 feet and it became uncrunk.

6          And so then she had to know the definition of crunk

7    and uncrunk.

8          And I told her, well, it was real simple.  You know,

9    you crank up a car, but if you cranked it up some time ago,

10   it's cranked.  But if you cranked it up a long time ago you

11   crunk it up.

12         And then when the car start running, obviously it

13   became uncrunk.  I can't understand what the problem is.

14         So I was constantly giving her a dictionary on

15   Ebonics, but also, back when I was trying cases, I was speaking

16   rapidly.  I started speaking much slower when I became a judge

17   because then I recognized the harm and the pain I had caused my

18   court reporters.

19         And since we need to keep these people, then I was

20   trying to be sure that they recognized that I was court

21   reporter friendly.  So help me in this endeavor, please.

22         MR. SOUSSI:  Yes, Your Honor.

23         THE COURT:  Okay.  So just take your time and the

24   thought that you have, you will hang on to it.  It won't go too

25   far.  And then just go ahead and blast me with it later.

1          Okay?

2          MR. SOUSSI:  Yes, Your Honor.

3          THE COURT:  Now go right ahead.

4          MR. SOUSSI:  Thank you so much.

5          Ahmed Soussi again on behalf of the plaintiffs.

6          Your Honor, Section 208 is clear.  Any person -- or

7     any voter with a disability may be given assistance by a person

8     of their choice other than their employer or union

9     representative.

10          Conflict preemption occurs when state laws create an

11     obstacle to the accomplishment and execution of the, quote,

12     purposes and objectives of Congress.  This is exactly what

13     Senate Bill 2358 does, and the discussion you had with opposing

14     counsel proves this, that Senate Bill 2358 limits more than

15     just a voter's choice on their -- a voter's choice.

16          Additionally, Your Honor, the Fifth Circuit is also

17     clear.  They have already established that Section 208 is

18     preemptive when state laws impermissibly narrow voters' choice.

19          What's also important, Your Honor, are the cases that

20     the defendants cite to.  They don't -- first of all, Your

21     Honor, federal courts, as we said, have shown little tolerance

22     on any narrowing in Section 208.  This bill, Senate Bill 2358,

23     limits for more -- I apologize, Your Honor.  The district court

24     cases that they cite to, Priorities, first of all, is wrong,

25     a -- quote, a person of their choice does not mean that there

1    is some sort of limitation.  Because as we cite to in our reply

2    brief, "a" can mean "any."

3          Additionally, if you go back into the congressional

4    record, Section 208's purpose was that voters with disabilities

5    are the best person to select.  They know which assister would

6    be able to assist them, and Congress said that even though the

7    state has interests, that they weigh these interests and said

8    that the voter must be able to be given that choice.

9          Defense talks about they want to -- their interest is

10   about making sure there is no crime or no fraud in voting.

11   Mississippi already has laws that protect against this, so this

12   issue is already protected.  And what Congress said in

13   Section 208 is that voters must be given the person of their

14   choice.  That's what the Fifth Circuit said as well.

15         Your Honor, and to your question, yes, defendants are

16   asking you to write a definition of "caregiver" which will not

17   be bound -- which county prosecutors won't by bound to and

18   state courts won't be bound to.  This shows an impermissible

19   narrowing.

20         And I just want to go quickly back to OCA-Greater

21   Houston because the restriction there was on an interpretator.

22   They said that someone can get interpretation assistance but it

23   had to be a registered voter.  The court said that was

24   impermissibly narrow.  So even if defendants argue that

25   plaintiffs' definition of 208 is, is overbroad, right, our

definition comes from the Fifth Circuit which said that was
impermissibly narrowed.  Senate Bill 2358 limits voters'
choices to only those few exceptions.

        And even though we have individual plaintiffs who
show that they don't meet these restrictions, our
organizational plaintiffs as well support this, Disability
Rights Mississippi, the protection and advocacy agency, they
have statutory authority to represent every single voter, every
single voter with a disability in Mississippi.  They have been
given associational standing in 208 cases that we cite to in
our brief.

        To the other remaining factors, Your Honor, defense
counsel said that they wanted to make sure every ballot, every
ballot is counted.  That's exactly what an injunction will do.
It will allow all qualified voters to vote.

        If this court doesn't enjoin Senate Bill 2358 when
absentee voting begins on July 29th, people are going to be
unsure if they could actually assist.  Ms. Cunningham is not --
is going to be unsure if she can assist Ms. Elise, which the
discussion here shows that is she a family member, if she's
not.  But the other thing that's for voters who don't have a
family member or caregiver, they need to be able to select the
person of their choice.  Senate Bill 2358 restricts it, so they
will face irreparable harm for the public interest and the
balance of equities, or for the balance of equities, Your

1   Honor, the longstanding quo here, the longstanding status quo

2   is to allow assisters to assist.

3          The Ninth Circuit said that was sufficient.  Feldman

4   versus Secretary of State, which shows it's sufficient here.

5          Unless the court has any other questions or...

6          No?

7          In conclusion --

8          THE COURT:  I discussed with Mr. Miracle whether

9   there was any fact finding to show that Mississippi has

10  suffered ballot harvesting in large numbers so as to manifest a

11  contention that this is a matter that is of dire concern.

12         Are you aware of any such findings?

13         MR. SOUSSI:  Your Honor, I'm not.  And Section 208 of

14  the vote -- or how conflict preemption occurs that whatever --

15  whatever record there is that the state tries to present.  What

16  they can't do is limit a federal right.  That's what the Fifth

17  Circuit said in OCA, that they can't grant someone saying, hey,

18  we're giving you a right for assistance but then narrow the

19  group that you're going to be able to select from.

20         So, no, we -- there wasn't any evidence, but even if

21  the defense tried to bring up evidence that, oh, we have an

22  interest, first, they already have laws that deal with voter

23  fraud.  That's covered.  But what they can't do is to go to a

24  voter with a disability and say, We're limiting your option

25  more than what federal law guarantees that you have.  That's

1    exactly what Senate Bill 2358 does.  If this court doesn't

2    enjoin -- doesn't issue an injunction, then on July 29th voters

3    like Mr. Whitley will be unable vote, and that's exactly why

4    we're here asking for this urgent motion.

5              In conclusion --

6              THE COURT:  What about the other two examples you

7    gave me?

8              MR. SOUSSI:  Yes.  Yes, Your Honor.

9              THE COURT:  Do you think those persons would be able

10   to function as they have in the past?

11             MR. SOUSSI:  Absolutely not, Your Honor.

12             And conflict preemption, when they talk about

13   obstacle, it doesn't have to be disenfranchisement.  Chilling

14   effect goes to the obstacle of Congress's purpose.  Congress

15   wanted people like Ms. Cunningham to go assist voters in her

16   community, and Senate Bill 2358 shows that she would -- she

17   fears the prosecution if she continues to assist.  So she's not

18   going to -- or she's not -- she won't -- she will be at risk if

19   she continues this.  And similarly for Ms. Gunn.

20             And to your question of whether she will be charged,

21   you and defense counsel had a discussion about, well, the state

22   might do this, the state might do that.  The whole issue is

23   avoiding that.  And that's what Congress did with Section 208.

24   They say the voter can select anyone other than those two

25   options, and in our plaintiff's example, they have been chosen.

1    But the fear of prosecution is too great.

2            THE COURT:  In your request for this injunctive

3    relief you are also asking for something that's proactive, not

4    just restrictive but proactive.

5            So in your motion for preliminary injunction you

6    asked the court to put the brakes on the act in question.  But

7    you are also asking that there be some proactive -- some

8    proactivity on behalf of the state to notify the persons of the

9    people of the state of this particular matter if the court

10   decides to allow it to go forward.

11           MR. SOUSSI:  Um-hum.

12           THE COURT:  Now, is that too far?

13           MR. SOUSSI:  No, Your Honor.

14           And we cited to cases in our brief that explain that

15   in voting matters, especially since the primaries are coming

16   soon, and since we're talking about communities with

17   disabilities, this word needs to be put out because the

18   Secretary of State tweeted out about how this law is in effect

19   and there's going to be criminal prosecution, which goes to the

20   fear of prosecution.  Voters need to know that they're going to

21   be -- that as opposing counsel said, every ballot should be

22   counted, and that's exactly what this affirmative statement

23   will do.  It will guarantee that every single vote in

24   Mississippi is counted when absentee voting begins July 29th.

25           THE COURT:  Let's go back over some of your

```
 1    authority --

 2                 MR. SOUSSI:  Yes, Your Honor.

 3                 THE COURT:  -- that you say support this proactivity.

 4           Talk to me about that.

 5                 MR. SOUSSI:  Sure, Your Honor.  We --

 6                 THE COURT:  Mr. Miracle made a specific point near

 7    the end of his presentation where he says that just goes too

 8    far, for them to -- for the state to be required to notify the

 9    citizenry of your interpretation or your side's interpretation

10    of this law.

11           Now give me your cases again.

12                 MR. SOUSSI:  Your Honor, I apologize.  Are you

13    talking about the authority to put out a statement or authority

14    on Section 208?

15                 THE COURT:  Authority to put out a statement.

16                 MR. SOUSSI:  So we cite to two cases in our reply

17    brief.  One of them is Thomas that talked about how the vote --

18    the word needed to go out, that voters needed to get the word

19    out because it was coming soon, and the other case, I

20    apologize, I don't remember on the top of my head, but we cite

21    to it in our brief.

22                 THE COURT:  Now, what were the facts in those cases?

23                 MR. SOUSSI:  I apologize, Your Honor.  I don't have

24    them on the top of my head.

25                 THE COURT:  Well, I don't either.  And when I was
```

1   going over the cases, since it was in the reply brief, and it

2   was near the back of the reply brief, I believe, I didn't get a

3   chance to see the facts of those cases.  I've seen all the

4   rest, but I didn't see that one.

5          So can you check with your team over here and see if

6   anybody knows what the facts were?

7          MR. SOUSSI:  Yes, Your Honor.

8          THE COURT:  Go right ahead.

9          Brain trust, here he comes.  Help him out.

10        (Conferring discussion.)

11        THE COURT:  All right, counsel.

12        MR. SOUSSI:  Your Honor, for Thomas, that was an

13  absentee witness requirement.  And those -- during COVID-19.

14  And they wanted to get the word out because of the emergency

15  situation, which is exactly what we have here.

16        July 29th is approaching, voters need to know that

17  they could still vote.  And without the affirmative statement,

18  this ruling, voters in Chickasaw County may -- other than our

19  plaintiffs -- may be unaware, which is why we stress that the

20  Attorney General and Secretary of State, just like they did

21  when they announced this criminal prosecution, go back and say

22  it's not in effect, voters can still vote.

23        THE COURT:  But you had said that you wanted some

24  proactivity.

25        MR. SOUSSI:  Yes, Your Honor.

1          THE COURT:  And so what form should that take?

2          MR. SOUSSI:  And we in our brief and in our motion we

3   state that any guidance with their normal position.  So any

4   type of statement would be, would be sufficient.

5          We're not asking for something specific.  But if the

6   court wants us to, we could come back and, you know, create

7   draft language that will specifically state what they would be

8   required to do.

9          THE COURT:  Well, what is contemplated by that

10  statement, that you wanted the state to make these

11  announcements?

12         MR. SOUSSI:  Just that Senate Bill 2358 is not into

13  effect for voters who, who have disabilities, who need to rely

14  on someone who isn't, you know, one of those three -- or one of

15  those exceptions of Section 208 voters being able to select the

16  person of their choice.

17         THE COURT:  All right.  And what about the second

18  case?  I believe you said there were two cases.

19         MR. SOUSSI:  Is it okay, Your Honor?

20         THE COURT:  It's fine.  Thank you.

21    (Conferring discussion.)

22         MR. SOUSSI:  Your Honor, thank you.

23         On the second case, Arlene, that dealt with voters

24  similar in COVID, voters having to go in person and they said,

25  no, that early voting was still allowed and that put out the

1    word that these voters can still vote early.

2            And, two, what we're asking, we're not asking the

3    Attorney General or Secretary of State to make an onerous

4    burden on themselves.  It's just the same thing they did when

5    the law was passed, put out guidance to make sure, to

6    guarantee, as defendant's counsel said, that every vote is

7    counted in Mississippi, which is why we're bringing this urgent

8    injunction because voting begins soon.

9            THE COURT:  Are you asking that all -- that if the

10   court allows this matter to go forward, that the court supply

11   some definitions?

12           MR. SOUSSI:  Your Honor, we believe any definition

13   would go against what 208 -- what Congress said 208's purpose,

14   and that was to make sure voters would be able to select the

15   person of their choice, other than an employer or union

16   representative.  Once we start talking about definitions, first

17   of all, it goes to show that there is a conflict into that

18   broad, wide-ranging purpose.  But also there is a question of

19   whether county prosecutors -- whether state courts are going to

20   be bound by this.  And all of a sudden you're going to have

21   different ZIP codes prosecuting this crime differently, which

22   is a much -- which is a whole separate issue.  Conflict

23   preemption states that if there is an obstacle, federal law

24   preempts state law.

25           Senate Bill 2358 creates this obstacle and it can't

1   be saved by -- by an opinion doing the legislature's job in the

2   first place.

3          THE COURT:  So then what are you requesting here in

4   toto, you know, across the board, should this court grant your

5   motion for a preliminary injunction, forbid this law to go into

6   effect on July 1, and that is with no exceptions, no part of

7   the law should go into effect; is that correct?

8          MR. SOUSSI:  No, Your Honor.  It's only to voters who

9   have the right under 208.  So voters who need assistance.

10         THE COURT:  Okay.  And then you are asking that a

11  public announcement be made that the assistance that was

12  provided to voters in the past can still be provided?

13         MR. SOUSSI:  Yes, Your Honor, keeping --

14         THE COURT:  No change?

15         MR. SOUSSI:  Yes, Your Honor, keeping the

16  longstanding status quo.

17         THE COURT:  And therefore there will be no criminal

18  prosecution, misdemeanor-wise, attached to that assistance.

19         MR. SOUSSI:  To voters who are disabled, who are

20  enforcing their 208 rights, correct.  Senate Bill --

21         THE COURT:  Under 208.

22         MR. SOUSSI:  Yes, Your Honor.

23         THE COURT:  But anyone who is indulging in voter

24  fraud will be under other laws of the state and can, as in the

25  past, be prosecuted.

1    MR. SOUSSI:  Absolutely, Your Honor.

2    And Senate Bill 2358 will still be in effect to

3  voters who are aren't covered under 208.

4    So they are still able to reach -- if -- the specific

5  goals of Senate Bill 2358, but as you mentioned, they have

6  other laws protecting against the harms they addressed today.

7    THE COURT:  And the 208, what we're talking about is

8  voter assistance?

9    MR. SOUSSI:  Yes, Your Honor, voters who are --

10    THE COURT:  You are saying, then, that the voter

11  assistance can continue as it did before there was talk about

12  this new law?

13    MR. SOUSSI:  Yes, Your Honor.

14    THE COURT:  Anything else that would be part of this

15  preliminary injunction?

16    MR. SOUSSI:  No, Your Honor, other than the, you

17  know, other than the defendants are unable to actually

18  prosecute under this law.

19    THE COURT:  Okay.  So they could not prosecute

20  anybody because, well, the law would be enjoined.

21    MR. SOUSSI:  Yes, Your Honor.

22    THE COURT:  And that would be it.

23    So that would be the sum extent --

24    MR. SOUSSI:  Yes, Your Honor.

25    THE COURT:  -- of what you are asking for.

1          And so this notion of redefining terms is repugnant

2     to you.  In other words, you don't want any redefinition of

3     terms that are listed in this law to explain further what it

4     allegedly might mean?

5          MR. SOUSSI:  Yes, Your Honor.  We believe that when

6     Congress was clear that anyone, other than those two, those are

7     the only restrictions, and any type of actual defining goes to

8     what the legislature should have done in the first place, not

9     what this court can do.  And it's that question of whether

10    we're going to have different ZIP codes doing different things

11    which creates a chilling effect going back to that obstacle of

12    conflict preemption.

13         THE COURT:  Okay.  Anything else you want to tell me

14    about?

15         MR. SOUSSI:  Hopefully I wasn't too fast, but other

16    than that, Your Honor, no.

17         In conclusion, we ask this court to enjoin this

18    action because absentee voting begins July 29th, which is why

19    we're here on an urgent motion, because Senate Bill 2358

20    impermissibly narrows the voter's choice.

21         Thank you, Your Honor.

22         THE COURT:  All right.

23         Now, Mr. Miracle.  Would you approach the podium,

24    please?  In fairness, I want to give you a chance to respond to

25    these two cases.

1          MR. MIRACLE:  So my response --

2          THE COURT:  Now, you were aware of these two cases --

3          MR. MIRACLE:  In their reply.

4          THE COURT:  -- which you sort of touched on them, and

5   I saw the names of the cases and I saw the blurb that

6   accompanied the two cases and what they allegedly said, but I

7   didn't see where there was any discussion of the facts of these

8   two cases.

9          MR. MIRACLE:  Well, so --

10          THE COURT:  And --

11          MR. MIRACLE:  I apologize, Your Honor.

12          THE COURT:  And so counsel has just now supplied me

13   some more information that would do that.

14          So then I want to hear your response to those two

15   cases with regard to this public announcement.

16          MR. MIRACLE:  My response would be that the equating

17   fact that we're here on a preliminary injunction on a law that

18   goes into effect in July, which is the ordinary course of

19   business, and equate that with COVID and things that were done

20   during COVID I don't think stand for the proposition that then

21   in every case, every case that comes before Your Honor where

22   someone's asking for a preliminary injunction, they're asking

23   you to stop something from talking effect.  That is what

24   injunctions do.

25          Under Rule 65 the court is well aware that they have

1   to be narrowly tailored, they have to be directed at the

2   person, tell them what they are prohibited from doing, all

3   those things that Rule 65 require.

4         So the COVID cases that he cites cannot stand for the

5   proposition that in all cases where, because we're close to a

6   date when this law will go into effect, that that's somehow an

7   emergency like we dealt with during the pandemic.  I would

8   categorically say those cases are inapposite.

9         Also, the notion that -- and he couldn't tell you

10  what this statement would say; he said, well, it would be

11  something that we would come up with.  The notion that the

12  court would craft an injunction that would order two state

13  officials to include certain language in public statements

14  under Rule 65 certainly violates the principle that injunctions

15  are to be narrowly tailored and only apply to the very specific

16  conduct that is to be enjoined.

17        Nor has he come before this court and said, Well,

18  there is going to be all this confusion statewide.  We don't

19  know who even knows about 2358.  We've heard some testimony, we

20  have heard some discussion about efforts that the two

21  organizations have made to educate people about the law going

22  into effect.  So -- but that's all we know.

23        So we have no proof before this court whatsoever

24  about what anybody knows or doesn't know about 2358 going into

25  effect.  So an order coming from this court that would direct

1   the Secretary of State and the Attorney General to say specific

2   things to the public I think violates all precepts of Rule 65.

3   And it's certainly not supported by two COVID cases where we

4   were in a different environment.  But what I heard him say was

5   we're here in an emergency.  Well, in some sense all

6   preliminary injunctions or TRO matters that the court hears

7   have some element of, you know, time attached to them.  But

8   that does not turn this into then that the Secretary of State

9   and the Attorney General have some legal obligation to make a

10  public statement.  I think that simply would go beyond the

11  scope of any permissible injunction if, and only if, the court

12  were to grant a very narrowly tailored injunction only limited

13  to the enforcement of Section 208 as it relates to the people

14  that are covered by 208, which he has confirmed for this court.

15  But to then say that there is some additional affirmative duty

16  beyond that, that simply I think goes beyond anything under

17  Rule 65 and would be subject to potential further review, and

18  unnecessary.

19          Because, again, there is no proof before this court

20  about what the public knows or doesn't know about 2358 other

21  than what efforts may or may not have been done by these

22  groups.  These same groups can educate their voters about what

23  the current state of the law is, as they have told the court

24  here today, they have been doing.  But, again, I think that

25  would, that would go well beyond the bounds of any, any

1    injunctive relief under Rule 65 to order two state officials to

2    say something in particular, as opposed to if the court says,

3    I'm enjoining this law from taking effect; then, like any other

4    injunction, the state officials are prohibited from

5    effectuating that law.

6         So unless the court has any further questions, I

7    don't have anything further on that point, Your Honor.

8         THE COURT:  All right.  Thank you.

9         Since it is your motion, then, you always get the

10   last word.

11        You styled your motion, quote, Memorandum of Law in

12   Support of Plaintiff's Urgent and Necessitous Motion for

13   Preliminary Injunction.  And I focused on the words "urgent"

14   and "necessitous."

15        Do you utilize those terms just because of the

16   approaching date when the law is supposed to go into effect or

17   was there some other reason why you added the words "urgent"

18   and "necessitous"?

19        MR. SOUSSI:  Your Honor, I believe it's both reasons.

20   The law goes into effect July 1st and absentee voting begins

21   July 29th.  But also the chilling effect that this law creates.

22   Opposing counsel said no one knows about this.  The

23   secretary -- the reason why we say it's a few exceptions is

24   because the Secretary of State tweeted out that, this law is in

25   effect, will only allow a few exceptions.  So it is known that

1     if someone assists, is not a family member, not a caregiver or

2     a household member, they will be subject to criminal penalties.

3            And because the organization's -- part of their

4     effort is kickstarting for the August primary to get out the

5     vote, make sure people -- because how Mississippi does absentee

6     voting, a voter isn't just able to go on election day to

7     register to vote.  It's a long process that we cite to in our

8     brief.  An absentee voter who votes by mail first has to apply,

9     then sends it in, then gets the ballot back and has to have

10    that as someone there to sign the ballot.  It's a long process

11    that will take time.  And from Ms. Cunningham's declaration

12    demonstrates that this is not something that just can occur.

13    Which is why we're here on this urgent motion, because

14    primary -- the, the assistance has already begun and that

15    chilling effect, that question is still there.

16           And to -- to defendant's other comment about this

17    injunction only being to the defendants.  First, Disability

18    Rights Mississippi covers every single voter within Mississippi

19    who has a disability, but also as we cite to in our brief, that

20    in voting cases for similarly situated plaintiffs -- similarly

21    situated people are able to benefit because here we're saying

22    this law is preempted on its face.

23           And we do have cases, Your Honor, that talk about

24    public statements that are outside of COVID.  One of them is

25    the Fish versus Kobach case, and in that case the defendant was

1   a party that continuously disregarded the court's orders, so

2   they said you had to put a statement out.  Which I understand

3   is different here.  But because the election is coming up and

4   because Mississippi has such a long process for voters to vote,

5   we believe that this statement will be part and parcel of this

6   injunction, to make sure, as defendants' counsel said, every

7   ballot is counted.

8            So unless the court has any other questions or...

9            In conclusion, Your Honor, we ask this court to grant

10  plaintiffs' motion in full.

11           Thank you.

12           THE COURT:  Mr. Miracle, did I see your hand?

13           MR. MIRACLE:  Yes, Your Honor.  If I may make one

14  final point, only because --

15           THE COURT:  Stand up then.  Go to the podium.

16           MR. MIRACLE:  Only because Your Honor raised the

17  point about the urgent necessitous motion, and now that it

18  seems that they're trying to seek some relief based on a

19  compressed time frame, I would note that this bill was signed

20  by the governor on March 23rd, 2023.  This lawsuit was not

21  filed till March -- May 31 or June 1st, somewhere in that time

22  frame.  It's on the filing.

23           So, again, I only raise that because the court has

24  brought this issue up about the timing.  And so there was a

25  considerable delay in coming to the court seeking injunctive

1  relief, and now they're saying, well, now we've got this

2  compressed time and all these things have to happen, and, you

3  know, that in and of itself, and it's not in our brief, but

4  that in and of itself, that delay can be seen as a lack of

5  irreparable harm.  I'm not suggesting that here, but to the

6  extent that the court is inquiring about the urgent,

7  necessitous nature, and now they're telling the court we have

8  to have certain relief because of this shortened time frame,

9  there was a long delay before this lawsuit was filed, that they

10 could have brought it earlier.

11         So I just think, out of fairness, I think that's

12 something that needs to be in the record.

13         THE COURT:  I need to give you back your last

14 statement.

15         This, this matter was filed May 31, 2023, just a few

16 days ago.  So then Mr. Miracle has pointed to that filing when

17 the -- this measure was passed before that, but he's pointing

18 to the fact that only recently was this matter filed before the

19 court.  And we set it as fast as we could once it was submitted

20 to us.

21         So you want to make a response?

22         MR. SOUSSI:  Yes, Your Honor.

23         We filed in a reasonable time.  But also, Your Honor,

24 the discussion of how this reflects that we don't have

25 irreparable harm is completely false.  Federal courts in all

1    districts, including the Fifth Circuit, have held that the

2    restriction on someone's right to vote is an irreparable harm,

3    and that goes to because once an election occurs, that voter

4    won't be able to get that back.  And for the assisters, the

5    fear of prosecution is so great, like you explained to opposing

6    counsel, this chilling effect of "Am I a family member, am I

7    this or am I that, I'm not even going to do this because I

8    don't want to be prosecuted" is irreparable harm.  So we filed

9    in a reasonable time, Your Honor.  And to argue that that

10   somehow means there isn't irreparable harm directly conflicts

11   with what the precedent is regarding injunctions.

12            And unless the court has any other questions, we ask

13   this court to grant plaintiffs' motion in full.

14            Thank you, Your Honor.

15            THE COURT:  Thank you.

16            Thank you for your spirited arguments.  And if you

17   have any additional authority that occurs to you, now that you

18   have made your arguments, additional authority which is not

19   contained in your brief, then submit it to me by Thursday

20   afternoon, 5:00 o'clock, so that I may consider it.

21            Now, with that, is there anything else from the

22   plaintiffs?

23            MR. SOUSSI:  No, Your Honor.  Thank you.

24            THE COURT:  All right.  Thank you so much.

25            Anything else from the defense?

1              MR. MIRACLE:  No, Your Honor.  Thank you.

2              THE COURT:  Then thank you so much.

3              Then I'll be in contact with you shortly.  But I will

4    await to see if you have any additional authority on this

5    matter, and arguments, then I'll go ahead and craft an opinion.

6              Thank you so much.

7              COURT OFFICER:  All rise.

8              (Proceedings concluded at 12:08 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF COURT REPORTER

2              I, Fred W. Jeske, RMR, CRR, Official Court Reporter

3    for the United States District Court for the Southern District

4    of Mississippi, appointed pursuant to the provisions of Title

5    28, United States Code, Section 753, do hereby certify that the

6    foregoing is a correct transcript of the proceedings reported

7    by me using the stenotype reporting method in conjunction with

8    computer-aided transcription, and that same is a true and

9    correct transcript to the best of my ability and understanding.

10             I further certify that the transcript fees and format

11   comply with those prescribed by the Court and the Judicial

12   Conference of the United States.

13

14

15

                            s/Fred W. Jeske
16                          FRED W. JESKE, RMR, CRR
                            OFFICIAL COURT REPORTER
17

18

19

20

21

22

23

24

25