1          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                    NORTHERN DIVISION

3

4   DISABILITY RIGHTS MISSISSIPPI, ET AL.          PLAINTIFFS

5   VERSUS                    CIVIL ACTION NO. 3:23-CV-00350-HTW-LGI

6   LYNN FITCH, ET AL.                            DEFENDANTS

7

8
                        STATUS CONFERENCE
9           BEFORE THE HONORABLE HENRY T. WINGATE,
            UNITED STATES DISTRICT COURT JUDGE,
10                    JULY 24, 2023,
                  JACKSON, MISSISSIPPI
11

12

13

14              (APPEARANCES NOTED HEREIN.)

15

16

17

18

19

20

21
   REPORTED BY:
22
      CANDICE S. CRANE, RPR, RCR, CCR #1781
23    OFFICIAL COURT REPORTER
      501 E. Court Street, Suite 2.500
24    Jackson, Mississippi  39201
      Telephone:  (601)608-4187
25    E-mail:  Candice_Crane@mssd.uscourts.gov

1    **APPEARANCES VIA VIDEOCONFERENCE:**

2        FOR THE PLAINTIFFS: AHMED SOUSSI, ESQ.
                             BRADLEY E. HEARD, ESQ.
3                            CASEY KATHARINE SMITH, ESQ.
                             CLAUDIA WILLIAMS HYMAN, ESQ.
4                            GRETA K. MARTIN, ESQ.
                             JESS EDWARD C. UNGER, ESQ.
5                            JOSHUA F. TOM, ESQ.
                             LESLIE FAITH JONES, ESQ.
6                            MING CHEUNG, ESQ.
                             SABRINA S. KHAN, ESQ.
7                            ARI J. SAVITZKY, ESQ.

8

9        FOR THE DEFENDANTS: DOUGLAS T. MIRACLE, ESQ.
                             GERALD L. KUCIA, ESQ.

10

11       ALSO PRESENT:      LEE JANOUS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **TABLE OF CONTENTS**

2     Style and appearances.................................... 1-2

3     Court Reporter's Certificate.............................  28

1        **IN OPEN COURT, JULY 24, 2023**

2

3        THE COURT:  Do a roll call.

4        MS. BARNES:  Good afternoon, everyone.  This is

5  Disability Rights Mississippi, et al. versus Lynn Fitch,

6  et al., Civil Action No. 3:23-CV-350-HTW-LGI.  We are here

7  this afternoon for a status conference.

8        At this time, I'm going to ask everyone to state their

9  names for the record starting with plaintiffs.

10        MR. SOUSSI:  Good afternoon, Your Honor.  This is Ahmed

11  Soussi on behalf of the plaintiffs.

12        MR. HEARD:  Good afternoon, Your Honor.  This is Brad

13  Heard, Southern Poverty Law Center, on behalf of the

14  plaintiffs.

15        MS. KHAN:  Good afternoon.  Sabrina Khan with the

16  Southern Poverty Law Center on behalf of plaintiffs.

17        MS. JONES:  Good afternoon.  Leslie Faith Jones, also

18  on behalf of plaintiffs, with Southern Poverty Law Center.

19        MR. UNGER:  Good afternoon, Your Honor.  This is Jess

20  Unger with Southern Poverty Law Center on behalf of

21  plaintiffs.

22        MR. CHEUNG:  Good afternoon, Your Honor.  Ming Cheung

23  from the ACLU on behalf of the plaintiffs.

24        MS. SMITH:  Good afternoon.  Casey Smith --

25        MS. HYMAN:  Your Honor, Claudia Williams Hyman from

1    ACLU Mississippi on behalf of the plaintiffs.

2          MS. SMITH:  Sorry about that.  Casey Smith, also with

3    the ACLU, on behalf of the plaintiffs.

4          MR. TOM:  Joshua Tom, ACLU Mississippi, on behalf of

5    the plaintiffs, Your Honor.

6          MS. MARTIN:  Greta Kemp Martin on behalf of the

7    plaintiffs, Disability Rights Mississippi.

8          MR. KUCIA:  Gerald Kucia and Douglas Miracle on behalf

9    of the defendants.

10         THE COURT:  Do I have anybody else on the line?

11         MS. JANOUS:  Yes, Your Honor.  This is Lee Janous with

12   the Secretary of State's Office.

13         THE COURT:  All right.  Good afternoon, everyone.

14         MR. SAVITZKY:  Ari Savitzky from the ACLU, also on

15   behalf of the plaintiffs.

16         THE COURT:  Say that again, please.

17         MR. SAVITZKY:  Your Honor, Ari Savitzky from the ACLU,

18   also on behalf of the plaintiffs.  Excuse the tardy

19   introduction.

20         THE COURT:  All right.  This is the case of Disability

21   Rights Mississippi, League of Women Voters of Mississippi,

22   William Earl Whitley, Mamie Cunningham, and Yvonne Gunn versus

23   Lynn Fitch, in her official capacity as Attorney General of

24   the State of Mississippi; Michael D. Watson, Jr., in his

25   official capacity as Secretary of State of Mississippi; Gerald

1   A. Mumford, in his official capacity as Hinds County Attorney;

2   and Elizabeth Ausbern, in her official capacity as Chickasaw

3   County Attorney.  This is civil action number

4   3:23-CV-00350-HTW-LGI.

5        Now, this is a status conference on the plaintiffs'

6   motion for preliminary injunction.  That matter is

7   outstanding.  This court has had a hearing previously on this

8   matter, and at the conclusion of that hearing, the Court asked

9   the parties to submit any supplemental authority that they

10  might want to submit.  They have submitted some supplemental

11  authority, and I will turn to the plaintiffs at this point to

12  hear about that supplemental authority even though I have

13  looked at it and read some of it already.

14       So who will be speaking on behalf of the plaintiffs?

15       MR. SOUSSI:  Your Honor, that will be me, Ahmed Soussi,

16  for the Southern Poverty Law Center.

17       THE COURT:  Say that again.

18       MR. SOUSSI:  Ahmed Soussi on behalf of the -- from the

19  Southern Poverty Law Center.

20       THE COURT:  All right.  You'll be speaking on behalf of

21  the plaintiffs here?

22       MR. SOUSSI:  Yes, Your Honor.

23       THE COURT:  And who will be responding on behalf of the

24  defendants?

25       MR. MIRACLE:  Good afternoon, Your Honor.  This is Doug

1   Miracle.

2        I will be responding on behalf of the defendants.  I

3   apologize for being in the same screen as Mr. Kucia, but my

4   sound on my computer was not functioning properly, so I'm

5   sitting next to Mr. Kucia, but I will be responding.

6        THE COURT:  Okay.  Let's start with the plaintiff.

7   Talk to me about your supplemental authority and why you think

8   that it has relevance.

9        MR. SOUSSI:  Yes, Your Honor.  This court asked for

10  additional guidance on the Secretary of State to issue a

11  statement about -- or clarifying Senate Bill 2358 to voters

12  who are confused, and just as it was imperative to have that

13  notice on the date of the hearing, it's even more imperative

14  now since we're in the middle of an election.

15       The confusion and chilling effect of Senate Bill 2358

16  of the terms not being defined is a reality that we alleged in

17  Ms. Mamie Cunningham's declaration speaking about Ms. Elise

18  not knowing if she can get -- or Ms. Cunningham not knowing if

19  she can provide that assistance to Ms. Elise.  Now that voting

20  has started, Ms. Cunningham fears prosecution and she doesn't

21  know how "family member" is going to be defined -- well, not

22  -- has told Ms. Cunningham -- told Ms. Elise that she would be

23  unable to assist her.

24       And originally in our -- on the date of the argument,

25  we cited to COVID-19 cases, but our filing actually shows that

1    it's not just COVID-19 cases that requires government

2    officials to actually put out statements.  We cite to multiple

3    cases that speak to the -- how notice is part and parcel of a

4    preliminary injunction because it's to ensure voters

5    understand their rights.  And with only a couple more weeks

6    left in the primary cycle, it's imperative that voters like

7    Ms. Elise but also assisters like Ms. Cunningham understand

8    that Section 208 of the Voting Rights Acts guarantees that

9    they will not be arrested or charged for assisting voters.

10        So we believe the cases clarify that this court has the

11   ability to ask the Secretary of State to make -- to issue --

12   to make reasonable steps in issuing or putting out

13   clarification that Senate Bill 2358 is not valid.

14        We also spoke about caregiver, Your Honor, in our

15   additional briefing, and we wanted to clarify, Your Honor, two

16   points about caregiver.  During our argument, there was a

17   discussion about whether a definition can be constructed that

18   will save that caregiver provision.  The issue as opposing

19   counsel admit on page 45 of the transcript is that every

20   single prosecutor is going to -- prosecutors won't be bound by

21   this rule -- by this court's persuasive judgment, that every

22   single prosecutor is going to have to make a decision on what

23   they consider a family member or a caregiver.  That causes a

24   chilling effect.  The same chilling effect that we see right

25   now during the primaries of people like Ms. Cunningham not

1   knowing if she can go out and engage with voters to provide

2   that assistance.

3        And even if this court were to come up with a

4   definition for "caregiver" -- which one of the things we

5   argued, though, is that the statute doesn't have any other

6   guidance to show where "caregiver" can be defined.  If the

7   Mississippi state legislature wanted to define "caregiver," it

8   could have done so, but it didn't, and this court can look at

9   other statutes in the code for Mississippi where they actually

10  define "caregiver."  Here there's no definition for

11  "caregiver" or "family member."  But even if this court were

12  to try to look at other sources of law, there isn't one clear

13  guidance what "caregiver" can mean.

14       One of the issues, as we said on the date of the

15  argument for defense's definition is that there are qualifiers

16  there, such as the caregiver has to provide a broad range of

17  services.  Ms. Cunningham does not provide a broad range of

18  services to all the people she assists.  She just helps people

19  return their ballots.  Moreover, for individuals in

20  facilities, defense made the argument that all of them would

21  be considered caregivers.

22       However, the definition the defense brings, the

23  significant personal relationship, is another issue, because

24  Section 208 of the Voting Rights Act gives the voter the

25  ability to decide who they want to assist them.  And by making

 1   a qualifier that they can only select someone with a

 2   significant personal relationship, that right there is

 3   narrowing -- impermissibly narrowing their right to select the

 4   person of their choice, which is exactly what the Fifth

 5   Circuit struck down in *OCA Greater Houston*.

 6          So in conclusion, Your Honor, we believe that there are

 7   other cases than just the COVID examples we cited to on the

 8   date of the argument that shows that this court can order the

 9   Secretary of State to take reasonable steps to issue guidance

10   and that any type of definition for "caregiver" unless it's as

11   encompassing as Section 208, will impermissibly narrow a

12   voter's right.

13          THE COURT:  Say that last part again.  Unless what?

14          MR. SOUSSI:  Unless "caregiver" encompasses what

15   Section 208 guarantees, that a voter may select the person of

16   their choice, anything other than that would impermissibly

17   narrow a voter's choice.

18          THE COURT:  All right.  Did you have any more authority

19   on this point?  Because you submitted just one case; am I

20   correct?

21          MR. SOUSSI:  No, Your Honor.  We submitted, I believe,

22   four total cases.  We have *Miller versus Bibb County School*

23   *District*, *Crowell versus Cobb County*, *Weinschenk versus*

24   *Missouri*, *League of Women Voters of Missouri versus Ashcroft*,

25   and once again *OCA Greater Houston.*  We had two exhibits on

1    our motion of the state cases, but we cited to three federal

2    court cases.

3            THE COURT:  All right.  Thank you.  We have all four of

4    those.

5            Now, then, it's the defense that only submitted one

6    case.  Mr. Miracle?

7            MR. MIRACLE:  Yes, Your Honor.  Thank you.  That's

8    correct.  We submitted one case.  It's a Fifth Circuit case we

9    believe answers this question definitively.  The authority we

10   cited to the Court was a situation in which the District Court

11   in Texas gave the Secretary of State two options of what

12   statement to submit, and the court found that was

13   impermissible, that the fact that the District Court gave the

14   Secretary of State a choice as to which of the statements

15   could be used, the court still found that impermissible

16   regardless of the choice, so that is why we submitted one

17   authority.  We believe that authority stands for the

18   proposition that such a statement that is being urged here is

19   impermissible, and therefore we would rest on that.

20           I would add to that, Your Honor, that Mr. Soussi made

21   some -- what were some rehashed arguments from our hearing.

22   You know, we believe this question about whether the Court

23   should issue an injunction to require the Secretary of State

24   to give a statement is not only impermissible in and of itself

25   but that, you know, we believe very strongly that injunctive

1   relief should be denied in its entirety for all the reasons

2   that we stated in our papers and at the hearing before the

3   Court on June 13th, so therefore this discussion about --

4   about ordering the Secretary of State to issue a statement now

5   that voting has started we simply believe is not only

6   impermissible under controlling Fifth Circuit case law but

7   given the fact that we believe this court should deny

8   injunctive relief.

9        Mr. Soussi is correct; this law went into effect on

10  July 1.  Absentee voting has been taking place, and therefore

11  voting is proceeding in an orderly fashion.  We are now two

12  weeks away from a primary election.  We believe any injunctive

13  relief at this time was not only inappropriate before the law

14  went into effect but now even more so problematic now that we

15  are 24 days into the operation of S.B. 2358 taking effect and

16  we're now on the eve of a primary election starting on

17  August 8th.

18       Absentee ballots were submitted on June 29th.  All

19  those individuals who are required to receive one, who have

20  permanent disabilities, all the normal mechanics and

21  operations of the Secretary of State's Office have been taking

22  place, and that includes since this law has now gone into

23  effect on July 1.

24       So for all the reasons we stated in our papers and on

25  the hearing before Your Honor and then the one additional

1    supplemental authority that would make such an ordered

2    statement by this court ordering the Secretary of State to put

3    out some yet-to-be-determined statement we believe is

4    foreclosed by the Fifth Circuit's opinion that we submitted to

5    Your Honor, so on those grounds, Your Honor, unless you have

6    any further questions, we stand as submitted.

7         THE COURT:  Mr. Miracle, if this court then agrees that

8    an injunction should issue, wouldn't the citizenry be confused

9    if an injunction goes into effect without some sort of

10   clarifying language?

11        MR. MIRACLE:  Well, Your Honor, you know, we have now

12   been 24 days into the operation of this law.  This law -- you

13   know, when we came before Your Honor on June 13th, the law had

14   not yet taken effect.  On July 1 the law did go into effect.

15   We are now 24 days post that law taking effect, and there are

16   certainly other considerations that now come into play.

17        But, Your Honor, I don't believe that the Fifth Circuit

18   decision that we cited to Your Honor would permit such a

19   statement.  We certainly, for the reasons we've already

20   indicated, argue that injunctive relief is not proper, that

21   the plaintiffs have not made their case, but even under the

22   best-case scenario, if the Court were to enter injunctive

23   relief, it should simply be that the law is enjoined, but,

24   Your Honor, beyond that, any confusion -- the law has been

25   operating since July 1.  The mechanics of the election process

1   have been proceeding, and that law is now in effect, unlike

2   post -- pre-July 1 when that law was not operational, but we

3   are now in a different environment, so we certainly think

4   injunctive relief is even more problematic at this point.

5       But to answer Your Honor's question, you know, without

6   conceding any argument that I've made previously with respect

7   to injunctive relief, at best we believe the only thing that

8   could be appropriate if the Court were to enter injunctive

9   relief is to enjoin further operation of the statute.  But,

10  again, we certainly do not believe that that would be the

11  appropriate course of action here.

12      THE COURT:  Well, let's go to whatever prejudice that

13  might befall the State and the defendants if such a statement

14  is ordered.  What would be the prejudice?  You've only argued

15  that this matter would be appropriate because of some

16  authority you've cited in support, you think, of your

17  argument, but other than that, what prejudice would the

18  defendant suffer?

19      MR. MIRACLE:  Well, I think broadly speaking, Your

20  Honor, a federal court ordering a state official to conform

21  their conduct under state law certainly implicates federalism

22  and sovereign immunity concerns, and that's what the Fifth

23  Circuit decision that we cited to Your Honor certainly attends

24  to.  So, you know, from a prejudice standpoint, whether we're

25  speaking a practical prejudice, but the legal prejudice is

1    that we believe for the reasons that the Fifth Circuit cited

2    and precluded the District Court in Texas from ordering the

3    Secretary of State to issue one of two statements, that that

4    is legally impermissible under that authority we have cited to

5    Your Honor.

6          And my -- you know, beyond that, Your Honor, who would

7    craft such a statement?  Who would approve such a statement?

8    You know, under Rule 65, obviously an injunction has to be

9    very specific as to who's enjoined and what they're enjoined

10   from doing.  That would also be a mandatory injunction as

11   opposed to a prohibitory injunction, and so I think there are

12   not only legal concerns but certainly practical concerns

13   about, you know, is the Court going to write that statement?

14         I just -- I think there's a whole litany of potential

15   problems with that statement, and we're now, again, within two

16   weeks of a primary election.  We're in a different landscape

17   than we were before the election, so I certainly think there

18   are potential problems under the Purcell Doctrine of

19   interfering with an election law that has now been in place

20   throughout the entire month of July and we're on the eve of an

21   election, so I would cite all those reasons as problems as to

22   why such a statement would be both practically and legally

23   prejudicial to the State of Mississippi, Your Honor.

24         THE COURT:  All right.  Let me go back to the

25   plaintiffs.

1          MR. SOUSSI:  Your Honor, a couple of points on

2     rebuttal.  First, I want to -- because defense counsel brought

3     up Purcell, I want to clarify that Senate Bill 2358 has no

4     election administration component.  It's about prosecutors

5     bringing claims.  So this law doesn't impact -- doesn't have

6     Purcell concerns as we argued originally on the date of the

7     hearing.

8          Additionally, Your Honor, as we stated in Docket 22,

9     our supplemental authority, we're not asking for a specific

10    language.  We're not asking for a specific statement.  Just

11    reasonable steps to clarify to voters.  And that's the

12    question that you posed to opposing counsel, whether voters

13    will be confused.  And the answer is yes.  As we explained,

14    Ms. Cunningham -- Ms. Elise doesn't know if she can get

15    support from Ms. Cunningham.  Moreover, for our organizational

16    plaintiffs, who are going into the community and educating

17    voters, they're having to expend these resources, and without

18    clear guidance from the Secretary of State that can reach

19    everyone, that is -- then voters won't be confused.

20         And I wanted to point this court to the *OCA Greater*

21    *Houston* decision.  At the District Court level, the Secretary

22    of State, what they did is they posted the Court's order on

23    their website, they contacted local county officials to tell

24    them what occurred, and they made -- they said they are going

25    to make changes to their handbook.  There wasn't an official

1    statement that was created.  The plaintiffs wanted further

2    relief, but the District Court said that what occurred was

3    sufficient, and it stressed, though, that if the defense

4    didn't make those steps, then a continual would occur.

5         When the Fifth Circuit reviewed this case in *OCA*

6    *Greater Houston*, they acknowledged that the defense took steps

7    that this injunction didn't need to occur any longer.

8         *Richardson*, Your Honor, though, the case that

9    plaintiffs *[sic]* cite to in their supporting documents, is

10   distinguishable for a couple reasons.  The first is that the

11   sovereign immunity argument doesn't apply here because the

12   Voting Rights Act abrogates sovereign immunity.  And

13   additionally, if the Court were to review what was required in

14   *Richardson*, it would see it's a stark contrast to what we're

15   asking here.

16        We're asking for reasonable steps just to clarify that

17   people won't be arrested or thrown -- or given a $3,000 fine

18   just for assisting voters.  In *Richardson*, the Court required

19   the government official to not only put a statement out but to

20   list exactly you need to have these four things in the

21   statement, and if you have to tell every single county

22   official that if they don't apply -- if they don't conform to

23   this, that they're going to be punishable.  So this is no

24   longer just taking reasonable steps.  It's actually telling

25   the Secretary of State that you have to bring proceedings

1    against government officials.

2        That's not what we're asking for here.  Just reasonable

3    steps to clarify to voters that within these next two weeks,

4    that you can go out and ask someone to go for that assistance.

5        Additionally, Your Honor, we also want to highlight

6    because this discussion about when the law took effect or when

7    it didn't, for the preliminary injunction motion, the date of

8    when the status quo is when we brought our litigation.  We

9    brought it weeks before the law went into effect.  So just

10   because the law is in effect now, the status quo that we were

11   preserving --

12       THE COURT:  Yes.  Could you slow down, please?  Just

13   slow down, please.

14       MR. SOUSSI:  I'm sorry.  I apologize.

15       THE COURT:  All right.  Start back over, and please

16   slow down.

17       MR. SOUSSI:  I apologize.  I would just stress again

18   that the status quo is when we filed our litigation.  So this

19   discussion of now that the law has went into effect doesn't

20   change whether a preliminary injunction should be issued.

21       And other than that, Your Honor, we -- we support that

22   you have authority to require the Secretary of State to take

23   reasonable steps and to clarify to voters that they have the

24   rights under federal law.

25       THE COURT:  What about what you mentioned a few moments

1    ago, posting on the website?  Why wouldn't that be enough?

2         MR. SOUSSI:  Your Honor, you have a question for me?

3    Yeah.  Your Honor, that's 100 percent a reasonable step to

4    make sure Mississippi voters understand their rights.  The

5    Secretary of State's website even states that this is the

6    place where people go to get information.  So the court said

7    in *OCA Greater Houston* -- the District Court said that was

8    sufficient.  The Fifth Circuit endorsed that, and we see that

9    as a reasonable step to make sure every voter understands.

10        THE COURT:  So then under that approach, then to be

11   posted on the website would simply be the Court's opinion; is

12   that correct?

13        MR. SOUSSI:  Yes, Your Honor.  We're not asking for

14   specific language, just reasonable steps to make sure voters

15   understand their rights.

16        THE COURT:  Well, but would posting on the website be

17   enough and be that reasonable step?

18        MR. SOUSSI:  Yes, Your Honor.

19        THE COURT:  So then would I have to order the Secretary

20   of State to put it on their website?

21        MR. SOUSSI:  Yes, Your Honor.  We believe that

22   because -- because of where we are in the middle of voting,

23   this is the part where the timing does matter.  There's only a

24   couple of weeks, that we want to make sure that people who are

25   going on to the website see that.

1          But one thing I would bring up, Your Honor, is that

2     this question doesn't have to be answered right now.  If the

3     Secretary of State takes step by themselves, then we wouldn't

4     need to bring action.  But if the Secretary of State

5     doesn't -- if we see that the Secretary of State doesn't

6     follow this injunction, then we could bring this issue again

7     about making sure voters understand.  But the most important

8     thing, Your Honor, is making sure we get some sort of decision

9     today to ensure that voters are allowed to vote in the next --

10    upcoming weeks.

11         THE COURT:  Let's go back to the defense.  Mr. Miracle?

12         MR. MIRACLE:  Yes, Your Honor.  Several points.

13         THE COURT:  Mr. Miracle, here's the question:  The

14    Mississippi Secretary of State maintains a social media

15    presence and has publicized Senate Bill 2358.  Why could the

16    Secretary of State not clarify/update the public through this

17    medium?  What's wrong with that?

18         MR. MIRACLE:  Well, Your Honor, I do think that still

19    begs the question of whether or not that would be a proper

20    order.  In *Richardson* that we cited, the court did say

21    notwithstanding whether or not the sovereign immunity concerns

22    in the context of a VRA case -- notwithstanding that issue,

23    the court still said that that ordered relief directing the

24    Secretary of State even to give one of two options was

25    improper.  So I will maintain, Your Honor, that I don't think

1    that that is an appropriate order in this case.

2         Now, I guess there's a second question of what

3    practically would be appropriate.  I mean, the problem we have

4    is the relief that was requested by the plaintiffs in their --

5    in their motion for preliminary injunction, you know, it

6    specifically talked about a statement, and now we're being

7    told, well, it just needs to be something reasonable that

8    counsel has not really defined.  In response to the Court's

9    question, they said, oh, yeah, posting it on the website, that

10   would be reasonable.  So we're seeing sort of a moving target

11   here with what respect would be even reasonable, assuming it

12   would be appropriate to do so in the first instance.

13        So I would point out that the relief they were asking

14   for initially was much, much more specific, and that's the

15   relief we responded to, and now I'm hearing something a little

16   bit different today that posting an order from this court

17   would be okay.  But I don't think ordering the Secretary of

18   State to post something very specifically on his official

19   social media account for the reasons that we've cited to the

20   Court in our supplemental authority would be an appropriate

21   form of relief.

22        THE COURT:  So are you saying that the Secretary of

23   State is against putting this on their social media?  Is that

24   your statement, Mr. Miracle?

25        MR. MIRACLE:  No, Your Honor.  Let me clarify and let

1    me be clear.  He's not against anything in particular.  What I

2    believe we're talking about is what injunctive relief this

3    court may order.  So I guess I want to be very clear the

4    Secretary of State is not -- is not taking a particular stance

5    on anything other than whether the Court orders him in his

6    official capacity as the Secretary of State to perform some

7    act.

8            I'm not sure if -- I want to make sure I'm answering

9    the Court's question specifically.  If the question is is the

10   Secretary of State opposed to doing this voluntarily, I don't

11   think that's -- I don't think that's the question, but we're

12   here in the context of the plaintiffs have asked this court to

13   grant them very specific relief, and now it's that he do

14   something specifically and overtly, either through his website

15   or via other means, so obviously the Secretary of State would

16   have to evaluate what this court may or may not order him to

17   do in his official capacity.  But I'm not saying he's opposed

18   to anything outside the context of this injunctive matter.

19           And if I misunderstood the Court's question about

20   whether he's opposed to it, I apologize, but I just want to

21   make sure I'm answering the question that this is not about

22   what his personal opinion is about what should or shouldn't be

23   posted, but it would be in respect to what relief the Court

24   may or may not entertain here.

25           THE COURT:  Mr. Miracle, I am aggrieved over this word

1    "caregiver" and --

2         MR. MIRACLE:  I'm sorry, Your Honor?

3         THE COURT:  I said I am aggrieved over this word

4    "caregiver," and especially since that term has not been

5    defined and especially since it opens up variant potential

6    interpretations from those who will be enforcing the criminal

7    provision of the statute in question.  So I am persuaded that

8    the plaintiffs have the better part of the argument on the

9    injunction that should issue against the statute based upon

10   these two points:  that there is no definition of "caregiver"

11   and, secondly, that this statute is prohibitive in that it

12   offers as an alleged violation some criminal sanctions.

13        So now that you have an idea where the Court is on this

14   matter, Mr. Miracle, since you don't want to see people

15   arrested on an imaginary crime, then are you saying that the

16   Secretary of State would not then assist in ensuring that that

17   does not happen?

18        MR. MIRACLE:  Your Honor, obviously I have not had the

19   opportunity to consult with the Secretary of State.  His

20   legal -- his general counsel is on the line, but we have

21   obviously not had an opportunity.  We did not know what the

22   Court's ruling was going to be with respect to the injunctive

23   relief, so I'm a little bit of a disadvantage of not being

24   able to speak on behalf of what he would or would not be

25   willing to do in light of the Court's ruling.

1          That's just a very practical matter at the moment that

2     I have not had an opportunity, nor has his legal counsel at

3     the Secretary of State's office obviously had an opportunity,

4     to discuss that matter with him.  So I would not be in a

5     position to speak for him about what he would be willing or

6     not willing to do.  I'm not saying he would or wouldn't be.

7     I'm not saying he wouldn't be -- he's obviously concerned

8     about the conundrum that the Court has just addressed, but I

9     think it would require consultation with him before I could

10    advise the Court of anything more definitive than that.

11         THE COURT:  Mr. Miracle, could you have an answer by

12    tomorrow afternoon, by 4:00?

13         MR. MIRACLE:  Yes, Your Honor.  And just so we're

14    giving the Secretary the proper question posed in light of the

15    Court's ruling that it is inclined to entertain -- or inclined

16    to grant preliminary injunctive relief against the enforcement

17    of S.B. 2358, is the question from the Court to the Secretary

18    whether or not he would be willing to take steps voluntarily

19    to communicate that court order?  I just want to be very

20    careful that I communicate the right information to Secretary

21    Watson.

22         THE COURT:  That's what I'm asking:  Would he be

23    willing to communicate the Court's opinion, the Court's

24    determination on this matter of injunctive relief?  And if

25    that's the case, then I will have crafted two or three pages

1   on the preliminary injunction granting such so that he could

2   put it on his website or put it on his social media page or

3   whatever.  So can you let me know, then, by tomorrow at 4:00?

4        MR. MIRACLE:  And just so I'm making sure I'm giving

5   him the correct choices, would -- in the Court's view of what

6   the Court is asking me to ask him, would posting the order on

7   his website be sufficient?  And I'm not speaking for him.

8   Since we're talking about the website of the Secretary of

9   State versus his social media pages, would -- in the Court's

10  view, what the Court is requesting, would posting the Court's

11  order on the Secretary of State's website be sufficient in the

12  Court's view?

13        THE COURT:  Let me turn back to the plaintiff.  I think

14  it would because at a minimum there would be the information

15  there, and these plaintiff organizations can inform their

16  people that they can go to the website to clarify what they're

17  saying that is confirmed that they will not be arrested.  That

18  sorely concerns me, the fear that they could be arrested.

19        Let me hear from the plaintiff.

20        MR. SOUSSI:  Yes.  Yes, Your Honor.  That's perfectly

21  fine.

22        THE COURT:  Okay.  So if you would have the Secretary

23  of State agree to that, then I will not order any additional

24  relief.  Just put it on there, and I will have available the

25  abbreviated order from the Court on this particular matter.

1        So, Mr. Miracle, can I hear from you, then, tomorrow at

2    4:00?  And everybody else will be on the line.

3        MR. MIRACLE:  Yes.  Do you want to do that -- are we

4    going to do that via Zoom, or am I to communicate that to the

5    Court in writing via e-mail to the Court's chambers and copy

6    all counsel on the Secretary's position?

7        THE COURT:  I think it would be faster just to go on

8    the same media we're using now, and everybody will hear it at

9    the same time.

10       Everybody here is voting for email.  Okay.  In that

11   case, then, Counsel, since we're going to email it, then we

12   can do it before 4:00.  Is that all right?

13       Mr. Miracle, what's the earliest you could get us an

14   answer?

15       MR. MIRACLE:  I am hesitating, Your Honor, only because

16   I am not in possession of the Secretary's schedule and I may

17   need to confer with Ms. Janous about that.

18       MS. JANOUS:  Unfortunately, Your Honor, I don't have

19   access to his schedule, but I can find out in the near future

20   what it looks like.

21       MR. MIRACLE:  Your Honor, I would say if we could have

22   until 1:00 p.m. tomorrow.

23       Do you think that will be sufficient time, Lee?

24       MS. JANOUS:  I don't have any reason to think not,

25   Doug, but I will check as soon as possible.

 1          THE COURT:  Okay.  If there's some need to change that

 2   time, then let me know as soon as possible.  Otherwise I'll go

 3   back to the Zoom.

 4          MR. MIRACLE:  Yes, Your Honor.

 5          THE COURT:  Okay.  Then I'll wait to hear from you by

 6   1:00 p.m.

 7          MR. MIRACLE:  Thank you, Your Honor.

 8          THE COURT:  All right.  All right, everybody.  We're

 9   disconnecting.

10   ****************************************************************

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF COURT REPORTER**

I, Candice S. Crane, Official Court Reporter for the United States District Court for the Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true, and correct transcript of the proceedings had in the forenamed case at the time and place indicated, which proceedings were stenographically recorded by me to the best of my skill and ability.

I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

THIS, the 27th day of July, 2023.

/s/ Candice S. Crane, RPR, RCR, CCR

Candice S. Crane, RPR, RCR, CCR #1781
Official Court Reporter
United States District Court
Candice_Crane@mssd.uscourts.gov